## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No. 08-10783-ELF |
| LEN POLICHUK a/k/a LEONID POLICHUK, | Chapter 7 |
| | Honorable Eric L. Frank |
| Debtor. | |
| BONNIE FINKEL, AS CHAPTER 7 TRUSTEE OF THE ESTATE OF LEONARD POLICHUK, | Adversary No. |
| Trustee, | |
| v. | |
| LEN POLICHUK, a/k/a LEONID POLICHUK, MARINA AYZENBERG, JOSEPH AYZENBERG, LENA POLNET, LARISSA LABED, ANDREW NECHIPORENKO (a/k/a ANDREW POLNET), FOX LAKE MANAGEMENT LLC, LLC, (a/k/a FOX LAKE MANAGEMENT LLC) METRO DEVELOPMENTS LLC, LAML MANAGEMENT INC., FOX LAKE REALTY LIMITED PARTNERSHIP, MARINA REINSURANCE, MOTOSTRADA LLC, NEW CENTURY REHABILITATION LLC, GREY HOUND PROPERTIES, LLC, LETTERLY REALTY, STEVEN KRAVITS, STEVEN RUTAKY, DYNAMIC FUNDING, JOHN DOES 1 TO 10 AND JOHN DOE CORPORATIONS OR PARTNERSHIPS 1 TO 10 | |
| Defendants. | |

## COMPLAINT OF THE TRUSTEE SEEKING RELIEF UNDER SECTIONS 502, 547, 548, 550, AND 544 OF TITLE 11 OF THE UNITED STATES CODE AND RULES 3007 AND 7001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

1296236-13                        1

Bonnie Finkel, Chapter 7 Trustee of the Estate of Len Polichuk a/k/a Leonid

Polichuk (the "Trustee") by way of Complaint against defendants Len Polichuk, a/k/a

Leonard Polichuk, Marina Ayzenberg, Joseph Ayzenberg, Lena Polnet, Larissa Labed,

Andrew Nechiporenko, Fox Lake Management LLC, LLC, a/k/a Fox Lake Management

LLC, Metro Development LLC, LAML Management Inc., Fox Lake Reality Limited

Partnership, Marina Reinsurance, Motostrada LLC, New Century Rehabilitation LLC,

Steven Kravits, Steven Rutaky, Dynamic Funding, Grey Hound LLC, Letterly Realty,

John Does 1 to 10 and John Doe Corporations or Partnerships 1 to 10 alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the parties and the subject matter pursuant

to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Venue of this matter is proper in this District pursuant to 28 U.S.C. §§

1408 and 1409.

4.      The statutory bases for the relief requested in this Adversary Complaint

are Sections 502, 547, 548, 550 and 544 of Title 11 of the United States Code (the

"Bankruptcy Code") and Rules 3007 and 7001 of the Federal Rules of Bankruptcy

Procedure.

## THE BANKRUPTCIES

5.      On January 31, 2008 (the "Petition Date"), Len Polichuk a/k/a Leonard

Polichuk (the "Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy

Code with the United States Bankruptcy Court for the Eastern District of Pennsylvania,

bearing Case No. 08-10783-ELF.

6.      The Trustee was appointed by the Court as the interim Chapter 7 Trustee for the estate of Leonard Polichuk on February 6, 2008, and thereafter became the permanent Chapter 7 Trustee.

## THE PARTIES

7.      The Debtor is an individual residing at 415 Worthington Mill Road, Richboro, Pennsylvania.

8.      Marina Ayzenberg ("Marina") is the wife of the Debtor and resides at 415 Worthington Mill Road, Richboro, Pennsylvania.

9.      Joseph Ayzenberg ("Joseph") is the father of Marina and father-in-law of the Debtor.  He resides in Pennsylvania.  He has at times resided with the Debtor at 415 Worthington Mill Road, Richboro, Pennsylvania.

10.      Lena Polnet ("Lena") is the sister of the Debtor and resides at 6 Williams Way, Churchville, Pennsylvania.

11.      Larissa Labed (Larissa) is the sister of the Debtor and resides in Pennsylvania.

12.      Andrew Nechiporenko (a/k/a Andrew Polnet) ("Andrew") was the husband of Lena and brother-in-law of the Debtor.  He resides in Pennsylvania.

13.      The Debtor, Marina, Joseph, Lena, Andrew and Larissa are sometimes referred to herein collectively as the "Polichuk Family Group."

14.      All of the members of the Polichuk Family Group are insiders as to the Debtor.

15.     Steven Kravits is an individual residing at 415 Worthington Mill Road, Pennsylvania, and is, and has been, involved in business ventures with Debtor and Marina.

16.     Steven Rutaky is an individual, on information and belief, involved in business ventures with Debtor and residing at 1363 Buttonwood road, Southampton, Pennsylvania.

17.     Fox Lake Management, LLC, LLC (a/k/a Fox Lake Management LLC) is or was a Pennsylvania Limited Liability Corporation with a place of business at 2473 Napfle Avenue, Suite A, Philadelphia, Pennsylvania.  Debtor is or was the owner of 100% of its stock and controlled the entity.

18.     Metro Developments, LLC is a limited liability company established on March 7, 2005, under the laws of the Commonwealth of Pennsylvania with a place of business at 2727 Philmont Avenue, Unit 300, Huntingdon Valley, Pennsylvania.  Vitally Polyachenko is currently listed as president.

19.     LAML Management, Inc. is a Pennsylvania corporation organized and incorporated on May 24, 2004, with a place of business at 51 Buck Avenue.  Debtor is Treasurer, Lena is President, Marina is Secretary, and Andrew Polnet is Vice President. On information and belief, Debtor and Marina each own 25% of this company.

20.     Fox Lake Realty Limited Partnership is a Pennsylvania limited partnership organized and established on June 14, 2004, with a place of business at 51 Buck Road, Huntingdon Valley, Pennsylvania, and its general partner is LAML Management Inc. in which Debtor owns or owned a 25% interest.

21.    Marina Reinsurance is an entity owned and operated by the Debtor in conjunction with the provision of warranty claims insurance sold through automobile dealerships in which Debtor had an ownership interest.

22.    Motostrada LLC ("Motostrada") is a limited liability corporation existing under the laws of the Commonwealth of Pennsylvania, established on August 11, 2005, with a registered office at 1825 Grant Avenue, Philadelphia, PA.  From its inception well into 2009, Debtor was the President of Motostrada.   Marina is a shareholder of Motostrada.

23.    New Century Rehabilitation LLC is a Pennsylvania Corporation organized on September 26, 2006, with a place of business at 7592 Haverford Avenue, Philadelphia, PA.

24.    Dynamic Funding is an entity in the real estate business in which Lena has an ownership interest, and which, on information and belief, has employed Debtor and Marina.  This entity, on information and belief, has possession of financial and other records of the Debtor and business entities he has been involved in.

25.    Grey Hound Properties, LLC is a Pennsylvania corporation with a place of business at 1363 Buttonwood Drive, Southampton, Pennsylvania.  On information and belief, Debtor owns or owned 50% of its stock.

26.    Letterly Realty is a Pennsylvania corporation with a business address at 1363 Buttonwood Drive, Southampton, Pennsylvania.  On information and belief Letterly Realty is owned 50% each by Marina and Kravits.

27.    John Does 1 to 10 and John Doe Corporations or Partnerships 1 to 10 are Pennsylvania business organizations.  On information and belief, the Debtor has operated

through other undisclosed business entities often with similar names to those named Defendants herein.  Also, on information and belief, the Debtor has pursued the business activities and schemes described herein through corporations and partnerships with other individuals not yet identified.  The Trustee has had limited discovery with which to prepare this Complaint and cannot yet identify all entities and persons who should be named as defendants herein.  Moreover, the Debtor has actively endeavored to conceal such information from the Trustee.  The Trustee describes them as Doe defendants so that they can be identified as discovery in this matter progresses.

28.    The total amount of claims filed to date by creditors of the estate of Len Polichuk (the "Estate") is $6,746,061.99.  This does not include certain claims which may exist in favor of taxing authorities, which are discussed further elsewhere herein.

29.    Two creditors filed fraudulent conveyance actions against the Debtor pre-petition.  The United States Trustee filed an adversary proceeding seeking to bar Debtor's discharge, to which Debtor ultimately consented.

## FACTUAL ALLEGATIONS

## DEBTOR'S GENERAL BUSINESS ACTIVITIES

30.    After coming to the United States in 1989, Debtor settled in the Philadelphia area and worked as an electrician for International Paper, among others, earning approximately $40,000 per year.  He then worked, at increasing salaries, as a computer programmer for the Taj Mahal and as a programmer for Cigna.  His highest salary in the period from 1994 to 1999 was approximately $80,000 per year.

31.    From 1999 to 2003, Debtor was involved in the operation of automobile dealerships where, on information and belief, although his wages exceeded $100,000, he claims to have suffered over one million dollars in losses.

32.    On information and belief, Debtor claims that during the four year period prior to his bankruptcy, namely 2004 through 2007, he had no wages and had little, if any, other income.

33.    In addition to his salaried jobs and the auto dealerships, Debtor has been involved in a number of other entrepreneurial business activities, such as real estate development, the pharmacy business, and health care facilities, among others.  These businesses have been operated through various entities, often with other family members. Debtor has testified that members of the Polichuk Family Group often make collective decisions on business investments and the nominal ownership of those investments. Most of the money for the family business in which the Debtor was involved, came from Debtor.  On information and belief, Debtor has not reported any significant profits from any of these businesses.  On information and belief, Marina's earnings were never sufficient for her to contribute any significant amount of money to the businesses.  Joseph recently earned $50,000 a year, and during most of his working life, he was a salaried manager in a factory not earning significantly more than that in the past.  None of the other members of the Polichuk Family Group made any significant gifts or documented loans to Debtor.

34.    At the time of their marriage in 1990, Marina did not own any significant assets or have any significant income.  Marina worked for a few years as a programmer

earning $60,000 - $70,000 per year.  In 2000, Marina went to work for Dynamic Funding earning approximately $25,000 per year.

35.     Debtor currently has and has had multiple accounts at Charles Schwab, (the "Schwab Accounts"), many held jointly with Marina.  The Schwab Accounts were Debtor's primary disclosed financial accounts, and prior to his bankruptcy, Debtor had well in excess of $3 million in these disclosed accounts.

## THE AUTOMOBILE DEALERSHIPS

36.     In and about 1997, Debtor became involved in refinancing the automobile dealership of his then friend, Sergey Naumovsky ("Sergey").   Debtor first invested $80,000, and his sister, Lena, invested $20,000.  Thereafter, Debtor became involved in other automobile dealerships.

37.     From 1999 to 2004 Debtor invested in, among other businesses, a Nissan dealership and a Mitsubishi dealership sometimes referred to collectively as the "Auto Dealerships" where he became an officer and shareholder.   Debtor was the dealer/operator at Autoplanet, Inc., the corporation that operated the Mitsubishi dealership, (referred to herein as "the Mitsubishi Dealership").  As the dealer/operator, Debtor was the person responsible to Mitsubishi for running the business.

38.     Debtor, as the dealer/operator, claimed to run a very successful Mitsubishi Dealership, achieving record sales in the region.  On information and belief, Debtor actually used the Auto Dealerships as personal checking accounts, drawing money when he wanted for his personal use.  On information and belief, Debtor also used the Auto Dealerships' credit cards and other accounts of the Auto Dealerships for his personal expenses and for the expenses of other businesses in which he was involved.

39.    In May of 2002, Mitsubishi, USA informed Debtor that the Mitsubishi Dealership's net worth had been reduced significantly.  Mitsubishi specifically included a reduction in value of the Mitsubishi Dealership by approximately $1.3 million in funds drawn by Debtor for his own use, and by use of dealership credit cards for Debtor's personal use.

40.    In connection with his dealings with the Mitsubishi Dealership, Debtor created and owned another entity, Marina Reinsurance, which served to finance warranty reinsurance at the Auto Dealerships.  On information and belief, Marina Reinsurance collected premiums to cover repairs that were actually performed by and charged to the Auto Dealerships.  At the closing of the Mitsubishi dealership there was an estimated profit of over $2,000,000 earned by Marina Reinsurance and unaccounted for by Debtor. Debtor claimed he has no corporate records or books of account of Marina Reinsurance.

41.    On November 10 and November 11, 2003, Debtor entered into a Stock Purchase Agreement, the terms of which had been in negotiation since at least the Summer of 2003, to sell all of Debtor's interest in Dunphy Nissan and all of his interest in SNL (an entity owning the Auto Dealership real estate).

42.    On information and belief, during the course of the operation of the Nissan Dealership and prior to the closing of the Stock Purchase Agreement in January 2004, Debtor caused the Nissan Dealership to incur debts and/or obligations which he and the Nissan Dealership failed to satisfy in the amount of approximately $1.6 million.

43.    On information and belief, during his operation of the Mitsubishi and the Nissan dealerships, Debtor siphoned off significant assets for his personal use.

44.    While Debtor sold the stock of the other Auto Dealerships, he only sold the assets of the Mitsubishi Dealership, and thus, remained an owner of the company.

45.    In January 2004, the Mitsubishi Dealership filed for bankruptcy. Thereafter, on information and belief it was brought to Debtor's attention that creditors of the Mitsubishi Dealership might assert certain claims against Debtor in the bankruptcy proceeding.  Some months later, the Mitsubishi bankruptcy was dismissed for failure to comply with certain court orders.

## THE DEBTOR'S CONCEALMENT AND TRANSFER OF ASSETS AND HIS ALLEGED MENTAL ILLNESS

46.    Debtor testified that from September 2003 until the Petition Date, he only held small jobs in building construction, mostly consisting of small projects for Marina's company or related companies, several of which are named Defendants herein.  Marina testified that Debtor performed minor tasks, such as delivering windows to building sites or making small repairs, for the companies with which she was involved.

47.    Debtor and Marina have both testified that sometime before September 2003, the Debtor became, in substance, mentally ill, was not fully in control of his faculties and spent some time in an undisclosed mental health facility under the care of unidentified doctors.

48.    Marina testified that Debtor had been losing all the family money by putting it into the Auto Dealerships.  She claims that she feared that his then partner, Sergey would get Debtor to put more money into the Auto Dealership.  On information and belief, since most of the assets of Debtor and Marina were provided by Debtor, Marina claims that in September 2003 she formed the intention, and acted on the intention, to secure the money in Debtor's accounts so that Debtor would not have access.

Debtor was well on his way out of the Auto Dealerships by late September 2003. Debtor testified that he believed he was not capable of handling his money or his business.

49.     During the month of September 2003, approximately $1,230,000 in funds were withdrawn from an account jointly held by Debtor, Marina and Lena, and then transferred and manipulated among accounts of members of the Polichuk Family Group.

50.     At his Rule 2004 examination, Debtor acknowledged facts that are set forth in the exhibits marked at that examination. Specifically, those exhibits show that on September 18 2003, funds from an account which Debtor previously held jointly with Marina, but which at the time of the transfer was held in the names of Debtor, Marina, and Lena, were journaled out. First $150,000 went to an account ending with the digits - 7367 held by Marina and Joseph. Then on September 22, 2003, another $380,000 was journaled to the same account; and on September 22, 2003, a third transfer, in the amount of $700,000 was journaled to the account of Marina and Joseph. This was preceded by the transfer of over $500,000 in funds from undisclosed sources into the Debtor and Marina's accounts during the early part of September 2003. Debtor and Marina testified that these transfers were made to prevent Debtor from squandering these funds on the Automobile Dealerships. On information and belief, by late September 2003, negotiations for Debtor to sell his interest in the Auto Dealerships had been going on for some months and were almost complete.

51.     The funds transferred into the account ending with digits - 7367 were then moved among accounts held by Joseph, Marina and Larrisa. Debtor testified that in 2003 and 2004, when these transfers took place he knew nothing about the transfers.

52.    On information and belief, this constant moving of money among various Polichuk Family Group members' accounts was designed to conceal and make more difficult, creditors' ability to trace the transfer of funds from an account in which Debtor was an owner, to business entities owned by Debtor.

53.    For example, in October 2003, $750,000 was removed from the Debtor's account held with Marina and came full circle back to an entity under Debtor's control.

54.    On October 12, 2003, Marina wrote a check on a Bank of Delaware account to Fox Lake Management LLC for $148,450.00, and on that date, Larissa Labed wrote a check to Fox Lake Management LLC on her joint account with Marina for $608,450.  On information and belief, those funds were deposited in Schwab account ending in digits - 1436 in the name of Fox Lake Management LLC, LLC.  In 2004, the income from that account was distributed to Debtor and in 2004, Debtor owned 100% of Fox Lake Management LLC, LLC.

55.    Debtor later testified under oath that it was not until September 2009 that he first learned of the transfer of $750,000 from the Schwab Accounts to Fox Lake Management LLC.

56.    In response to subpoena, Debtor has declared that he does not have any books or records of Fox Lake Management LLC, LLC.

57.    In 2004 and 2005, Debtor again signed a writing to the effect that he was the 100% owner of Fox Lake Management LLC, LLC and in 2004, the 25% owner of Fox Lake Realty Limited Partnership.

58.    On information and belief, there are as yet undisclosed changes in ownership of business entities, and multiple business entities with changed or similar

names that may have been used by Debtor and the rest of the Polichuk Family Group to further conceal their activities.  On information and belief, Debtor has access to books and records of certain of the named defendant business entities he has not disclosed in response to the subpoena served on him.

59.    In 2003, the sum of $100,000 was transferred from an account, in which Debtor had an interest, to a Schwab account ending with the digits - 9832.  The Debtor testified under oath that, despite he and Marina's years of investigation, they had been unable to obtain any information about the identity or ownership of that account.  Debtor testified that he believed the money had possibly been stolen.  Debtor and Marina produced nothing in response to subpoenas to show the disposition of this money.

60.    According to records subpoenaed from Charles Schwab, the sum of $100,000 was transferred from the former Debtor/Marina account to a Schwab account ending in the digits - 9832.  This account was held in the name of Nationwide Consulting Company.

61.    The Schwab records of the account ending in the digits - 9832, show that the $100,000 transferred from Debtor's account with Marina was thereafter journaled out to a Schwab account ending in the digits - 1436.  That is an account in the name of Fox Lake Management LLC, LLC, an entity at that time owned by Debtor.

62.    On information and belief, the Debtor's testimony that he and Marina could not obtain from Schwab the information as to where the $100,000 went is another effort of members of the Polichuk Family Group to conceal the manipulation of funds.

63.     On information and belief, the purported premise for these transfers, supposedly to keep access away from Debtor, was a sham in which Debtor, Marina, Joseph, Larissa and Lena all actively participated to conceal Debtor's involvement.

64.     On information and belief, Debtor has transferred the assets he held in Fox Lake Management LLC, LLC without any consideration.

65.     On information and belief, some time in late 2005, Debtor claims to have "left" the Fox Lake Realty Partnership, thus conveying his 25% interest to Lena.  Such alleged conveyance was made to Lena without payment or consideration.

66.     Alternatively, Debtor still maintains an interest in Fox Lake Realty Partnership and has acted on its behalf.

67.     Debtor testified under oath in 2009, that he has never given anyone a gift valued at more than $50,000.

68.     Debtor has never filed a gift tax return.

69.     On information and belief, there was no consideration for any of the transfers described hereinabove.

70.     On information and belief, substantially all the money in the accounts held by Debtor and Marina in September 2003, came from the Debtor.

71.     On information and belief, the Polichuk Family Group took active efforts to conceal the nature of ownership of the account funds, the transfer and/or movement of funds through various accounts, and the ultimate destination of the funds.

## **THE MOVEMENT OF POLICHUK FAMILY FUNDS**

72.     Prior to the September 2003 efforts by the Polichuk Family Group described above, there was a series of transactions where money was shifted among

family members, often with no explanation.  From April 17, 2000 to September 1, 2003 there were deposits totaling approximately $2.9 million, most without explanation, made into Debtor and Marina's joint account.  There were withdrawals, in the same period, totaling approximately of $3.5 million, many of which are also unsupported.

73.    After the September 2003 transactions described specifically above, that is for the period of October 1, 2003 up to about September 26, 2008, there was a more diverse pattern of withdrawals, deposits and transfers from, to and among accounts in the name of Marina and Andrew Nechiporenko, Marina and Joseph, Marina and Larissa and Marina Reinsurance Company, with a total of approximately $2 million of deposits into all accounts combined, and $4.5 million in withdrawals from all accounts combined. This is the period after the Auto Dealership had been sold and during which Debtor claims he was not involved in any business.  On information and belief, these transfers included transfers made by the Debtor directly, and included transfers made by others with money which was obtained from the Debtor's account.

74.    On November 10, 2005, Marina opened a Schwab account ending in the digits 9081 in her name individually.  This account was funded with a transfer of investments and a journal transfer of funds from Schwab account ending in the digits 2935, an account in the name jointly of Marina and Andrew.

75.    On information and belief, the original source of the funds placed in Marina's account was money owned by the Debtor and moved through various accounts. The total amount of funds in the account ending in digits - 9081 at that time was $131,274.00.

76.     On or about November 10, 2006, Marina and the Debtor executed a Power of Attorney, regarding account ending in digits - 9081, had it notarized by Larissa, and submitted it to Charles Schwab.

77.     The full Power of Attorney granted to Debtor as agent:

> "This grants your Agent the authority to trade in your account, to transfer or withdraw money and securities in your account, including into the name of the Agent, and generally to take any other actions with respect to your account in the same manner and to the same extent as you are permitted to do."

78.     On January 20, 2007, Debtor and Marina filed an application with Charles Schwab signed by both of them, as required signatories, adding margin and short sale capabilities to the account ending in digits - 9081.

79.     On the power of attorney, Marina signed as the account holder, listing her employment as a Manager of Dynamic Funding.

80.     On November 10, 2006, Debtor signed, as an authorized agent on the account, listing his employment as a manager at Fox Lake Realty.  Debtor represented his annual income at $200,000 and represented an approximate net worth, excluding residence, at $3,000,000.

81.     Over the life of the account ending in digits - 9081, various transfers were made into and out of the account, often to undisclosed recipients.  The account value in January 2007 was a little over $200,000.  In February 2007 it increased to over $550,000.  More deposits were made, but within a few months, and all during the period of one year prior to the Petition Date, the account was nearly depleted by withdrawals and transfers totaling over $800,000.

82.   During the period 2005 to 2007, Debtor and Marina maintained a checking account into which hundreds of thousands of dollars in cash were both deposited and withdrawn.  The following transactions were all on that Bank of America Account ending in the digits - 0242:

a.   On March 19, 2005, Debtor wrote a check in the amount of $36,000 payable to cash and endorsed by Debtor.

b.   On March 22, 2005, Debtor wrote a check in the amount of $35,000 payable to cash and endorsed by Debtor.

c.   On June 17, 2005, Debtor wrote a check for $195,000 payable to Len Polichuk and endorsed by him.

d.   On June 21, 2005, Debtor wrote a check for $44,572.70 payable to Wachovia Bank and earmarked for Len Polichuk Account ending in digits - 4192.

e.   On June 22, 2005, Debtor wrote a check to Marina Ayzenberg for $45,000 and deposited by her in account ending in digits - 7367, a Schwab account in the name of Marina and Joseph.

f.   On July 1, 2005, Debtor wrote a check for $5,000 to Len Polichuk and endorsed by Len Polichuk.

g.   On September 19, 2005, Debtor withdrew $78,125 in cash from the account.

h.   On September 12, 2005, Debtor wrote a check for $205,000 payable to Marina Ayzenberg and endorsed by her into Charles Schwab Account ending in digits - 7367, an account in the name of Marina and Joseph.

i.   On September 14, 2005, Debtor wrote a check to Len Polichuk in the amount of $23,255 and endorsed by him.

j.   On October 6, 2005, Debtor wrote a check to Wachovia Bank in the amount of $22,480.50 and earmarked it for Lena Polichuk Account ending in digits - 4192.

k.   On October 15, 2005, Debtor wrote a check to M. Ayzenberg for $47,000 and earmarked it for Account ending in digits - 7367.

l.      On October 28, 2005, Debtor wrote a check for $25,000 to Greyhound Properties and earmarked it for 751 Preston.  It was deposited into account ending in digits - 4688.

m.      On November 3, 2005, Debtor wrote a check to I. Fedenko for $9,950 and earmarked it a loan.

n.      On November 9, 2005, Debtor wrote a check to M. Ayzenberg for $25,000.

o.      On November 9, 2005, Debtor wrote a check to Len Polichuk for $9,950 and it was endorsed by Len Polichuk.

p.      On November 30, 2005, Debtor wrote a check to Lena Polnet for $34,783 and labeled it loan repayment.

q.      On December 5, 2005, Debtor, wrote a check to USPS for $1,008.63 and labeled it postage.

r.      On December 19, 2005, Debtor wrote a check for $18,000 to cash and endorsed it.

s.      On December 19, 2005, Debtor wrote a check to Len Polichuk for $11,000 and endorsed it.

t.      On August 15, 2006, Debtor signed a withdrawal slip for $38,000 directed to M. Ayzenberg.

u.      On August 21, 2007, Debtor signed a withdrawal slip for $5,000 directed to M. Ayzenberg.

v.      On April 30, 2007, Debtor signed a check for $12,000 to "3 for Life Towing."

83.     Most of the money withdrawn by Debtor was either in the form of checks payable to Debtor and endorsed by Debtor, or in checks made payable to cash and endorsed by Debtor.  Thus, during the period from March 2005 to April 2007, Debtor withdrew and came to hold approximately $411,000 in cash.  On information and belief, he used said cash to make transfers without adequate and/or any consideration, or alternatively, he used said cash to buy assets which he has either failed to disclose or

which were transferred to and are currently held in the names of others, for Debtor's benefit.

84.     During that same period, Marina drew out approximately $385,000.

85.     Debtor did not list or disclose those funds, the disposition of those funds, or any assets purchased with those funds at the time of the filing of his bankruptcy petition or at any time thereafter.

86.     Debtor has testified that during the period of these withdrawals, his wife provided most of the money to run the household and that he was not involved in any business activity, aside from minor construction work performed.

87.     On information and belief, the proceeds of these funds were transferred to others without consideration and the resulting assets have been concealed from creditors and the Trustee.

88.     This money was under Debtor's control during the entire period that hundreds of thousands of dollars were withdrawn and transferred.  Debtor has failed to account for the use or whereabouts of those funds or the assets acquired with said funds.

89.     On information and belief, part of the funds withdrawn by Debtor and Marina from these accounts were used to pursue business endeavors and buy assets now in Marina's name.

90.     On information and belief, the funds were transferred without value and/or without any consideration.

91.     Alternatively, on information and belief, assets acquired have not been revealed by Debtor or are held in the name of others and have not been revealed to the Trustee.

92.    On information and belief, Marina, by her involvement in this joint account, actively participated in a conspiracy to conceal and transfer assets of the Debtor.

### DEBTOR'S INTEREST IN AND ACTIVITIES ON BEHALF OF OTHER BUSINESSES

93.    Debtor testified that after 2003 he only did minor construction projects and/or worksite deliveries and only earned, at most, a few thousand dollars per year.

94.    On information and belief, Debtor actually played management roles in various companies which appear to be owned directly or indirectly by him and/or his family and friends, and he either reaped secret benefits from those business operations, or in the alternative, he was not fairly compensated and those entities were unjustly enriched by said services.

A.    **Metro Developments, LLC**

95.    Metro Developments LLC ("Metro") is a partnership owning real estate and involved in the development and sale of real estate.  The partner with the largest interest in Metro is Marina.

96.    On information and belief, Debtor is involved in the business of Metro. Debtor did work for and on behalf of Metro for which he was not compensated.

97.    On information and belief, Marina's interest in Metro was acquired for $400,000 in 2005.

98.    On information and belief some or all of the money used to acquire this interest in Metro came from Debtor and/or from accounts into which Debtor's funds had been placed.

99.    On information and belief, Debtor has an interest in Metro through Marina and both Marina and Metro have benefited from his uncompensated services and contributions of assets.

100.    In 2006, the value of the partner's capital in Metro was $1.2 million, one third of which was owned by Marina.

101.    On May 1, 2006, Metro entered into a contract with Cardeno Goodson Construction Co., Inc.  In the contract, Metro designates Debtor to represent it during the performance of said contract and Metro granted Debtor authorization to execute written modifications and/or material additions to the contract.

102.    On April 11, 2005, work was performed by Debtor at a company called "Power Sports" located at Philadelphia Industrial Development Corp, 2600 Centre Square West, 1500 Market St., Philadelphia, Pennsylvania.

103.    On August 5, 2005, work was done by Metro for Grey Hound Properties, LLC, an entity in which Marina has an ownership interest.

104.    In April 2006 through June 2007, other work done for and billed to Metro was done at a Metro work site located at Dorrance St. in Philadelphia, Pennsylvania, and work done at Marina's property was billed to "Len Polichuk" at Metro Development.

105.    Work done at a job site located at Carey Street for Fox Lake Limited Partnership in June 2006 was paid for by a check from Fox Lake Limited Partnership. That check was endorsed by Debtor.

106.    On information and belief Metro was unjustly enriched by accepting Debtor's services without payment and by buying property from Debtor at less than fair value.

107.    A house located at 618 E. Johnson Street, Philadelphia, Pennsylvania, was bought by Debtor and Vadim Shklovsky for $11,000 on March 21, 2006.  On August 4, 2006, they sold the property to Metro for $11,000.  On December 19, 2008, Metro sold the property to Y. Hawthore for $124,000.

108.    A house located at 4901 Wayne Street, Philadelphia, Pennsylvania, was bought by Debtor at a Sheriff's sale on March 6, 2006 for $34,500 and sold by Debtor six months later, on August 11, 2006, to Metro for $1.00.

109.    On March 13, 2006, a house located at 5626 Boyd Street, Philadelphia, Pennsylvania was bought by Debtor at a sheriff's sale for $7,400 and sold by Debtor on August 2, 2006 to Metro for $1.00.  It was sold by Metro on February 21, 2008 for $78,000.

110.    On information and belief, these transfers were for less than fair consideration at a time when Debtor was insolvent and were done with the intent to defraud creditors.

111.    On information and belief, through these conveyances of property for amounts equal to or less than the cost of purchase, and through Debtor's rendering of services without compensation or remuneration, Debtor was able to transfer assets and value without a fair consideration into a company from which he and/or his wife would and have significantly benefited.

**B.    Motostrada**

112.    Motostrada LLC ("Motostrada") is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1825 Grant Avenue, Philadelphia, Pennsylvania.

113.    On information and belief, Debtor was an officer of Motostrada at the time Motostrada was organized, continuing into the year 2009.  Motostrada is in the business of exporting used cars from the United States for sale in the Russian Federation and the Republics of the former Soviet Union.

114.    Debtor testified that he conducted business on behalf of Motostrada on various visits to Russia and Bulgaria.  On information and belief, Debtor has been involved in other activities on behalf of Motostrada, including travel abroad and within the United States.

115.    On information and belief, Debtor traveled to Finland and worked on Motostrada business relating to the release of vehicles.  He performed these services without compensation.

116.    To facilitate these and other activities relating to Motostrada, Joseph and Marina arranged for money transfers among their accounts and for wire transfers to auto auction facilities.

117.    Marina financed purchases of cars by Motrostrada.

118.    On information and belief, the funds used by Marina and Joseph for the purchase of cars and other Motostrada activities came from Debtor's funds.

119.    On information and belief, Marina acquired 50% of Motostrada in or about 2005 or 2006, and Steven Kravits held 50%.

120.    On information and belief, Debtor rendered services to or for the benefit of Motostrada for which he was not compensated.  Debtor received no wages or other remuneration from Motostrada.

121.    Alternatively, on information and belief, Debtor has received undisclosed benefit, and/or benefit has been given to others on his behalf from his dealings with or on behalf of Motostrada, or have increased the value of Marina's interest in Motostrada.

## C.   New Century Rehabilitation LLC

122.    On information and belief, Debtor received money from the operation of New Century Rehabilitation LLC ("New Century") during the period between October 2006 and 2008.

123.    New Century was formed in approximately October of 2006 and was operated as a chiropractic clinic by a resident physician.

124.    On or about April 29, 2007, Dr. Caroline Barry ("Dr. Barry"), the resident physician, became the President and Controller of New Century and provided the chiropractic care of patients, start to finish.

125.    Dr. Barry testified, under oath, that there were days in which she would see 40 to 50 patients per day and charged $150 to $200 per person.  She, alone, performed all of the work at the clinic except for minor administrative tasks performed by a front desk clerk.

126.    Dr. Barry testified under oath that the clinic was started by Lena Polnet and Len Polichuk.

127.    As compensation for her services, Dr. Barry received a salary and 25% of the profits of the business.

128.    Dr. Barry testified under oath that the balance of the profit, 75%, went to Lena Polnet and her brother (Len Polichuk).

129.    Dr. Barry testified that she was friends with Larissa, Lena and with Debtor.

130.    Dr. Barry testified that both she and Lena Polnet had checkbooks to write checks on the New Century account.

131.    On information and belief, an event has recently occurred which has caused Dr. Barry to raise questions about the accuracy of some of her sworn testimony.

132.    On information and belief, Debtor rendered services for New Century for which he was not compensated.

133.    Alternatively, on information and belief, Debtor received payments or other assets from New Century, which he has not disclosed and which remain undisclosed.

**D.    Other Corporate and Partnership Entities**

134.    Debtor was the 100% owner of Fox Lake Management LLC, LLC in all of 2004 and 2005.

135.    Debtor was a partner and 25% owner of Fox Lake Realty Limited Partnership in all of 2004 and 2005.

136.    Debtor was a partner in Grey Hound Properties LLC ("Greyhound") in at least 2005.

137.    On October 28, 2005, Debtor signed a check to Grey Hound from his joint account with Marina in the amount of $25,000.

138.    On information and belief, there was no consideration for this payment.

139.    On information and belief, Debtor performed services for Grey Hound for which he was not compensated.

140.    On information and belief, Debtor and Marina had an interest in Dynamic Funding.

141.    Debtor worked as a manager at Dynamic Funding in at least 2004.

142.    On information and belief, during this period, Debtor received no wages or other compensation for his work.

143.    Marina was a partner in Fox Lake Realty Ltd. Partnership in 2004 and 2005. She was a partner in Metro Development LLC in at least 2005 and 2007. On information and belief, the profits which resulted from Debtor's work for or on behalf of Metro remains with the company and/or have been otherwise transferred for the benefit of Marina.

144.    In at least 2007, Marina was also a partner in Letterly Realty LLC and Grey Hound.

145.    On information and belief, Debtor has rendered services for Letterly Realty LLC and for Grey Hound for which he was not compensated.

146.    On information and belief, through his interest in and providing services to these entities, Debtor has transferred money, assets, services, or other items of value to or for the benefit of other members of the Polichuk Family Group, which he has not declared on his schedules and which he has, knowingly conspired with Marina and the other members of the Polichuk Family Group, sought to conceal from creditors and now from the Trustee.

147.    These transfers were made without consideration at a time when the Debtor was insolvent.

**Certain Other Property Transfers of Debtor**

148.    On January 23, 2006, a property located at 2526 Hagert Street, Philadelphia, Pennsylvania, was bought by the Debtor at a sheriff's sale for $25,500 and resold on May 19, 2006, for $5,000 to Steven Kravits, a longtime friend of Debtor.

149.    On information and belief, Debtor's $20,500 loss was a transfer to Steven Kravits for less than a fair consideration at a time when Debtor was insolvent.

150.    On July 24, 2002, Debtor and Lena bought a property located at 207 Elbridge Street, Philadelphia, Pennsylvania from Federal Home Loan Mortgage for $61,000.  On September 26, 2003, during the period that Debtor asserted that he was unable to conduct business because of his alleged mental instability, they sold the property to Andrew, Debtor's brother in law for $1.  A year later, on September 30, 2004, Andrew sold it back to Debtor and Lena for $1.00 and on June 17, 2007, Debtor and Lena sold it to Elena Kholbystova for $142,000.  On information and belief, the purpose for this transaction was to conceal Debtor's interest in the property for a period of time.

151.    On information and belief, in relation to the real estate transactions described above, the Debtor, members of the Polichuk Family Group, related business associates, and business entities have obtained and concealed profits in rehabilitated real estate.

152.    On these transactions alone, including the Metro transfer, Debtor took property that he purchased for $139,100 and sold it for $16,300.  Thus, he appears to have incurred a loss of $123,100.  On information and belief, the transfers by Debtor were for less then a fair consideration.  Just three of the properties were later sold by the purchasers for $202,142.

153.    In 1997, on information and belief, Marina and Debtor purchased or built a house at 415 Worthington Mill Road, Richboro, PA.

154.    Upon information and belief Debtor's funds were used to acquire and build the home.

155.    On September 26, 2003, Debtor and Marina sold their home to Andrew Nechiporenko and Marina for $1.00.  This is a large house with an "in-law suite," where Marina's parents lived at times.

156.    On May 6, 2004, Marina and Andrew sold the house to Marina for $0.

157.    On information and belief, Debtor has been a concealed owner of the property at all times and his name was removed from the deed in 2003 only as part of the Polichuk Family Group's effort to avoid claims against Debtors assets and to place assets in their own names.

158.    On January 30, 2007, Debtor, as authorized agent for Fox Lake Realty, LP signed a deed conveying property located at 515 Crown Street in Morrisville, Pennsylvania conveying it to Marina for the sum of $210,000.  The property had been purchased by Fox Lake Realty on January 5, 2005.  Larissa Labed, as Notary Public, acknowledged that Debtor was authorized to sign as an agent for Fox Lake Realty, LP.

159.    Similarly, on September 12, 2006, Debtor signed a deed as authorized agent on behalf of Metro Developments, LLC, conveying the property located at 5109 Aspen St., Philadelphia, Pennsylvania, to Julia Adestein for $30,000.  Again, Lena notarized the document.

**DEBTOR'S TAXES**

160.    On information and belief, during the operation of the Auto Dealerships described hereinabove, Debtor took in excess of $800,000 in unreported taxable distributions, and in excess of $80,000 of unentitled tax deductions particularly related to the automobile business.

161.    In addition to the amounts set forth above, on information and belief, Debtor used funds of the Mitsubishi Dealership and of the Nissan Dealership to pay personal expenses and/or the expenses of other business entities in which Debtor and/or his family were involved.

162.    On information and belief, Debtor charged expenses for Debtor's personal and other business interests to the Nissan and the Mitsubishi Dealership.

163.    On information and belief, even if the Debtor's Federal and State Tax returns are otherwise accurate, the Debtor would still have substantial tax due, together with interest and penalties, as a result of the facts described herein.

164.    Proofs of claim have been filed in these proceedings which currently do not have included in them, any unpaid back taxes arising out of the events described hereinabove.

**DEBTOR AND MARINA VIOLATED THE AUTOMATIC STAY
PURSUANT TO §362**

165.    The Debtor and Marina violated the automatic stay when they attempted to settle a claim with Sergey which improperly released Sergey from certain claims not exempted by the Debtor on his Statements and Schedules.

166.    Upon the filing to the Debtor's bankruptcy case, the fraudulent conveyance action brought pre-petition by Sergey was stayed and became property of the estate and/or an action belonging to the Trustee.

167.    The aforementioned settlement was a violation of the automatic stay because the claim was at all times, from and after the Petition Date, property of the Debtor's estate and/or only actionable and/or waivable by the Trustee.  The estate created pursuant to section 541(a) of the Bankruptcy Code includes causes of action belonging to the debtor at the time the case is commenced.

168.    By attempting to settle, discontinue and end a certain fraudulent conveyance action brought by Sergey pre-petition, such inducement by Debtor and Marina constituted an intentional violation of §362 of the Bankruptcy Code.

169.    Debtor and Marina entered into the Settlement Agreement which provided for, among other things, a release of Sergey from any claims by the Debtor.  The release was not limited to the claims against Sergey which were exempted by the Debtor on his Statements and Schedules.  The Trustee's rights were recognized only in the covenant not to sue provision of the Settlement Agreement, and were not recognized in the general release provision.

170.    To the extent the Debtor and Marina induced Sergey to withdraw his fraudulent conveyance action, which was brought by him as an alleged creditor of the Debtor's estate against third parties, such action constitutes an intentional violation of §362 of the Bankruptcy Code.

171.    The Trustee is thus entitled to judgment in her favor and against the Debtor and Marina, declaring them in contempt of the Bankruptcy Code and entitling the

Trustee to compensatory and punitive damages, costs and attorneys fees and such other relief as the Court deems appropriate.

## THE BULGARIAN REAL ESTATE

172.    Debtor was required by law to disclose on his schedules all real property in which he had an interest.  Debtor declared he had no interest in any real property.

173.    On information and belief, Debtor has now, and had at the time of filing his schedules, an interest in a resort condominium in Sozopol, Bulgaria.  The purchase price for the property was approximately 63,000 Euro, or approximately $94,000.

174.    The Debtor testified that Marina never went to the condominium, and that he only used it once.  On information and belief, Debtor used this property when he was traveling from Russia on business relating to Motostrada.  Despite a subpoena and numerous demands, Debtor has failed and refused to produce pertinent legal documents, including title to the property.

## POWER SPORTS FACTORY

175.    On November 15, 2005, Debtor signed a check on his joint account with Marina at Bank of America to Steve Rutaky for $150,000 with the notation "Power Sports Factory" on the front.

176.    No explanation of this transaction or investment appears in Debtor's schedules or in documents produced by Debtor and Marina pursuant to subpoenas issued to them.

177.    On information and belief, no consideration was given for this transfer.

178.    The transfer was made at a time the Debtor was insolvent.

## TRANSFER OF FIDELITY ACCOUNT

179.    On information or belief, on January 31, 2007, the Debtor and Marina were the owners of a Fidelity account ending in the digits - 3686.  On January 31, 2007, the Fidelity account had a net value of $72,877.04 consisting of cash and mutual funds.

180.    On information and belief, the funds in the account came from the Debtor.

181.    On or about February 27, 2007, Marina and/or Debtor caused all of the cash and mutual funds in the Fidelity account to be transferred to an account at Charles Schwab, ending in the digits - 7367, held in the names of Marina and Joseph.

182.    This transfer was made within one year of filing of the bankruptcy petition.

183.    This transfer was made by and to insiders.

184.    On information and belief, there was no consideration for this transfer.

185.    On information and belief, this transfer was made in an effort to avoid the claims of creditors.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for an Accounting, Repayment of Funds and For the Imposition of a Constructive Trust

186.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

187.    Upon information and belief, Defendants and/or entities controlled by Defendants had an interest in and/or received payments, benefits and/or services from

Debtor and/or one or more other entities managed and controlled by Debtor. Defendants substantially profited at the expense of the estate of Debtor, and Debtor's creditors.

188.   The course of dealings between the Debtor and Defendants is a complicated series of transactions, often involving other parties, with portions of the transactions being either concealed or disguised.

189.   The Trustee is entitled to obtain a full and accurate description of the amount and use of the funds, benefits and/or services conveyed directly or indirectly to or for the benefit of any or all of the Defendants, or other entities the Defendants controlled or in which the Defendants had an interest, for the time period referenced in this Complaint either from Debtor, from one or more entities or individuals controlled by Debtor, or with funds the Debtor allowed to be used, to assist the Trustee and the Court in the resolution of this controversy.

190.   On information and belief, the Debtor and the Polichuk Family Group were involved in a program of fraud and misrepresentation whereby assets were transferred and monies were paid to the Defendants, including the Polichuk Family Group, in a series of mutual and complicated account transactions and transfers. On information and belief, the primary purpose of the program was to conceal assets in which Debtor maintained an interest or power.

191.   The Trustee does not possess an adequate remedy at law.

192.   The Trustee is entitled to and demands an accounting of all funds, benefits and services received directly or indirectly by or for the benefit of any or all Defendants, including those paid to other entities the Defendant(s) controlled or in which the Defendant(s) had an interest to include, *inter alia,* the description and amount of each

transaction, the entity or individual(s) that withdrew or were paid the funds, and the ultimate use or disposition of the funds or other things of value for the time period referenced in the Complaint.

193.    Upon a determination of the disposition of said funds or items of value that Defendants received from Debtor, the Trustee demands the return of those assets, property or otherwise, as an asset of the estate and/or the imposition of a constructive trust on those assets wherever they may reside and/or judgment for a return of the assets or their value, and such other relief as the court may determine to be just and proper.

## COUNT II

### Against Marina, Joseph, Lena, Dynamic Funding, Grey Hound, New Century Rehabilitation and Motostrada for a Preference

194.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

195.    The Trustee also specifically makes reference to the transfers described in the following paragraphs of the Complaint.  The Motostrada Transfers (¶¶ 112-121), the New Century Rehabilitation Transfer (¶¶ 122-133; 146-7), the Grey Hound Transfers ¶¶ 136-139; 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Polichuk Family Transfers, (¶¶ 150, 179-185) "the Transfer."  Other preferences may be disclosed after the completion of the accounting requested in Count I.

196.    Pleading in the alternative, at the time of the transfers the Defendants were "creditors" of the Debtor within the meaning of section 101(10) of the Bankruptcy Code.

197.    Some of the transfers constitute a transfer of an interest of the Debtor in property within the meaning of section 101(54) of the Bankruptcy Code relating to "transfers."

198.    Some of the transfers were by way of the Debtor rendering services for which no compensation was paid.

199.    Each of the transfers was to or for the benefit of Defendants.

200.    Pleading in the alternative, each of the Transfers was made on account of an antecedent debt allegedly owned by the Debtor before such transfer was made.

201.    Each of the transfers was made while the Debtor was insolvent.

202.    Some of the transfers were made on or within 90 days before the date of the filing of the Debtor's bankruptcy petition, were made or between 90 days and one year before the date of the filing of the Debtor's bankruptcy petition under section 547(b) of the Bankruptcy Code, or were concealed from discovery because of Defendants' and Debtor's acts to conceal the transfer.

203.    Each of the following Defendants was an insider as to Debtor: Marina Ayzenberg, Joseph Ayzenberg, Leonard Polichuk, Larissa Labed, Andrew Nechiporenko, LAML Management, Inc., Motostrada LLC, Fox Lake Management LLC, LLC, Greyhound Properties LLC.

204.    Each of the transfers enabled the Defendants to receive more than the receiving Defendants would receive if (i) the transfers had not been made, and (ii) the applicable Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

205.    Each of the transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

206.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, for the benefit of the estate of the Debtor.

## COUNT III

**Against the Members of the Polichuk Family Group Except Debtor, Fox Lake Management LLC, LLC, Metro Development, LLC, Motostrada LLC, New Century Rehabilitation LLC, Grey Hound Properties LLC, Letterly Realty, Steven Kravits, Steven Rutaky and Dynamic Funding for Fraudulent Transfer11 U.S.C. §§548(a)(1)(A), 550 and 551**

207.   Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

208.   The Trustee also specifically makes reference to the following paragraphs of the Complaint: the Polichuk Family Group 2003 Transfer (¶¶ 47-71); the Polichuk Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139 and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150); the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity Transfers (¶¶ 179-185) (the "Transfers").   Other Fraudulent Conveyances may be disclosed after this completion of this accounting requested in Count I.

209.   The Transfers of an interest of the Debtor or an obligation of the Debtor were made on or within two years before the filing of the Debtor's bankruptcy petition or

were concealed from discovery due to Defendants' and Debtor's intentional acts to conceal the transfers.

210.   The Transfers were made by the Debtor with the actual intent to hinder, delay or defraud some or all of the Debtor's then existing or future creditors.

211.   Some of the transfers were of property which constituted, a substantial part of Debtor's property.

212.   Debtor claims to unable to manage his financial affairs.

213.   Many of the transfers were to family members with whom Debtor had a special relationship in the ownership of assets.

214.   Some of the transfers were by way of the Debtor rendering services for which no compensation was paid.

215.   Debtor retained or obtained rights regarding the ownership and control of much of the transferred property.   Debtor obtained benefits and exercised domain over the transferred property.

216.   The Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

217.   As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of the Debtor.

## COUNT IV

**Against the Members of the Polichuk Family Group Except Debtor, Fox Lake Management LLC, LLC, Metro Development, LLC, Motostrada LLC, New Century Rehabilitation LLC, Grey Hound Properties LLC, Letterly Realty, Steven Kravits, Steven Rutaky and Dynamic Funding for Fraudulent Transfers 11 U.S.C. §§548(a)(1)(B), 550 and 551**

218.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

219.    The Trustee also specifically makes reference to the following paragraphs of this Complaint: the Polichuk Family Group 2003 Transfer (¶¶ 47-71); the Polichuk Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139 and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150); the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity Transfers (¶¶ 179-185) (the "Transfers").  Other fraudulent transfers may be disclosed after completion of the accounting requested in Count I.

220.    The Transfers of property in which the Debtor had an interest were made on or within two years before the filing date of the Debtor's bankruptcy petition or were concealed from discovery within two years before the Petition Date because of Defendants' and Debtor's intentional acts of concealment.

221.    The Debtor received less than a reasonably equivalent value in exchange for each of said Transfers.

222.    Some of the transfers were by way of the Debtor rendering services for which no compensation was paid.

223.    Creditors of the Debtor were detrimentally affected.

224.    At the time of each of the Transfers, the Debtor was insolvent, or became insolvent, as a result of the Transfers in question.

225.    At the time of each of the Transfers, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which capital remaining with the Debtor was an unreasonably small.

226.    At the time of each of the Transfers, the Debtor intended to incur, or believe that he would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

227.    The Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

228.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of the Debtor.

## COUNT V

**Against the Members of the Polichuk Family Group Except Debtor, Fox Lake Management LLC, LLC, Metro Development, LLC, Motostrada LLC, New Century Rehabilitation LLC, Grey Hound Properties LLC, Letterly Realty, Steven Kravits, Steven Rutaky and Dynamic Funding for Fraudulent Transfer Under Pennsylvania Uniform Fraudulent Transfer Act 12 Pa.C.S. §5104 and Bankruptcy Code §§544, 550(a), 551 and 1107**

229.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

230.    The Trustee also specifically makes reference to the following paragraphs of this Complaint: the Polichuk Family Group 2003 Transfer (¶¶ 47-71); the Polichuk Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139 and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150); the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity Transfers (¶¶ 179-185) (the "Transfers").  Other fraudulent transfers may be disclosed after the completion of the accounting requested in Count I.

231.    At all times relevant to the Transfers, there was and is at least one or more creditors who have held or hold matured or unmatured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

232.    The Transfers described above, from the Debtor to Defendants, were made with the actual intent to hinder, delay or defraud the creditors of the Debtor; or were

made by Debtor without the Debtor receiving a reasonably equivalent value in exchange for the transfer or obligation.

233.    Some of the transfers were by way of the Debtor rendering services for which no compensation was paid.

234.    At the time of each of the Transfers, the Debtor was insolvent, or became insolvent as a result of the Transfers in question.

235.    At the time of each of the transfers, the Debtor was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

236.    Certain Defendants were also insiders of the Debtor.

237.    The Transfers were made within four (4) years of the Petition Date, and/or within four (4) years of the pre-petition lawsuits brought for fraudulent conveyances; or to the extent more than four (4) year prior to the petition date were concealed from creditors; or in the alternative, all Transfers occurred well within ten (10) years from the Petition Date.

238.    As a result of the foregoing, pursuant to sections section 5104 of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S.§5104, and sections 544(b), 550(a) and 551 of the Bankruptcy Code, Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c)

recovering the Transfers, or the value thereof, from the Defendants for the benefit of the

estate of the Debtor.

239.   Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act, the

transfers to the Defendants as set forth above are void.

## COUNT VI

**Against the Members of the Polichuk Family Group Except Debtor, Fox Lake Management LLC, LLC, Metro Development, LLC, Motostrada LLC, New Century Rehabilitation LLC, Grey Hound Properties LLC, Letterly Realty, Steven Kravits, Steven Rutaky and Dynamic Funding for Against All Defendants for Fraudulent Transfer Under Pennsylvania Uniform Fraudulent Transfer Action Section 5105, 12 Pa. C.S. §5105 and Bankruptcy Code §§544, 550(a), 551 and 1107**

240.   Trustee repeats and realleges each and every allegation contained in the

previous paragraphs of this complaint as if fully rewritten herein.

241.   The Trustee also specifically makes reference to the following paragraphs

of this Complaint: the Polichuk Family Group 2003 Transfer (¶¶ 47-71); the Polichuk

Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America

Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century

Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139

and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty

Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150);

the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity

Transfers (¶¶ 179-185) (the "Transfers").   Other fraudulent transfers may be disclosed

after the completion of the accounting requested in Count I.

242.   At all times relevant to the Transfers, there was and is at least one or more

creditors who held or hold matured or unmatured unsecured claims against the Debtor

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

243.    The Transfers described above were fraudulent as to the Defendants because the Debtor made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers and the Debtor was insolvent at the time of the Transfers, or the Debtor became insolvent as a result of the Transfers.

244.    Some of the Transfers were by way of the Debtor rendering services for which no compensation was paid.

245.    Defendants were insiders of the Debtor.

246.    As a result of the foregoing, pursuant to section 5105 of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. §5105, and sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of the Debtor.

## COUNT VII

### Against the Polichuk Family Group Defendants for Civil Conspiracy to Conceal the Assets of the Debtor

247.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

248.    Other conduct in aid of the conspiracy may be disclosed after the accounting requested in Count I.

249.    The Defendants knowingly agreed to and participated in fraudulent conduct in concert with one another and with Debtor as described in detail as to separate Defendants hereinabove.

250.    The facts described above constitute, not only direct evidence of conscious behavior, but also provide circumstantial evidence of conscious misbehavior and/or recklessness.

251.    At these times when the Transfers occurred, Defendant was under the constant threat of litigation or other claims and generally adopted a policy of concealing assets he really controlled.

252.    Debtor transferred, manipulated and/or concealed assets in such a way as to defraud his creditors and to hide his assets from creditors.

253.    Defendants, who acted in concert with Debtor, by knowingly and willingly participating to defraud Debtor's creditors, have engaged in a civil conspiracy to participate in fraudulent conduct.

254.    The Defendants and Debtor are involved in and have at all times pertinent hereto been involved in, a continuing course of conduct to mislead the Trustee and conceal the Debtor's true assets.

## <u>COUNT VIII</u>

### **Against All Defendants Except Debtor in the Alternative for Conversion**

255.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

256.    The Trustee also specifically makes reference to the transfers described in the following paragraphs of this Complaint: the Polichuk Family Group 2003 Transfer

(¶¶ 47-71); the Polichuk Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139 and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150); the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity Transfers (¶¶ 179-185).   Other acts of conversion may be disclosed after the completion of the accounting requested in Count I.

257.    Debtor was the owner of various accounts, funds and assets described hereinabove.

258.    Some of the Transfers were by way of the Debtor rendering services for which no compensation was paid.

259.    Defendants wrongfully seized and/or obtained those assets and converted them to their own use.

260.    In the alternative, Defendants accepted those assets or funds for safekeeping and have refused to return all of them despite due demand.

261.    The Trustee demands the return of those assets or the reasonable value thereof as shall be determined in these proceedings, or the imposition of a constructive trust on the proceeds current investigation of those assets.

## COUNT IX

### Against All Defendants Except Debtor for Unjust Enrichment

262.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

263.    The Trustee also specifically makes reference to the allegations of the following paragraphs of this Complaint: the Polichuk Family Group 2003 Transfer (¶¶ 47-71); the Polichuk Family Group account ending in digits – 9081 transfer (¶¶74-81); the Bank of America Transfer (¶¶ 95-111 and 143); the Motostrada Transfers (¶¶ 112-121); the New Century Rehabilitation Transfer (¶¶122-133 and 146-7); the Grey Hound Transfers (¶¶ 136-139 and 145-7); the Dynamic Funding Transfers (¶¶ 140-142, 145-7); the Letterly Realty Transfers (¶¶ 144-147); the Kravits Transfers (¶¶ 148-149); the Lena Transfer (¶ 150); the Real Estate Transfers ¶¶ 150-159); the Rutaky Transfers (¶¶ 175-178); the Fidelity Transfers (¶¶ 179-185).  Other instances of unjust enrichment may be disclosed after the completion of the accounting requested in Count I.

264.    The Defendants received benefits from the Debtor, received benefits on account of the Debtor's property, and/or received benefits on account of Debtor's services and/or transfers.

265.    Some of the transfers were made by way of the Debtor rendering services for which no compensation was paid.

266.    The Defendants have been unjustly enriched by the receipt and use of the Debtor's resources, assets and services, while providing little, or no, compensation to the Debtor.

267.    Defendants understood the nature, quality and value of those benefits they were receiving from Debtor, and accepted and retained them in circumstances in which it would be inequitable for them to retain the benefit without payment of value in exchange.

268.    Defendants accepted and retained such benefits under circumstances that make it inequitable for Defendants to retain the benefit without payment of value.

269.    The Defendants have been unjustly enriched by the misappropriation of the Debtor's assets, resources and/or services as set forth herein.

270.    The Trustee respectfully requests that judgment be entered in her favor and against Defendants in an amount to be determined after appropriate accounting is made together with interest, costs, attorneys fees and such other and further relief as this Court deems just and proper.

## COUNT X

### Against All Defendants for Turnover of Property of The Estate

271.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

272.    Defendants are or were, during this case in possession, custody and/or control of Debtor's property under § 541 of the Bankruptcy Code.  The value of said property is not of inconsequential value and the Trustee could use or sell said property for the benefit of creditors.

273.    The Trustee is entitled to have all property of the estate turned over pursuant to 11 U.S.C. § 542.

274.    The Trustee is entitled to the value of any property hereunder to the extent Defendants are unable to return said property to the estate.

## COUNT XI

### Against All Defendants for Recovery of Property
### Pursuant to Section 550

275.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

276.     As described in the preceding paragraphs, and the claim made in Counts II, III, IV and V.  Defendants are mediate transferees of certain avoidable transfers made to them indirectly, of assets of Debtor.

277.     Pursuant to section 550 of the Bankruptcy Code, once these avoidable transfers are avoided pursuant to sections 544, 547 and/or 548 of the Bankruptcy Code, the Trustee is entitled to recover, for the benefit of the estate of Debtor, the value of such avoidable transfers.

278.     By reason of the foregoing, the Trustee is entitled to an order and judgment under section 550 of the Bankruptcy Code allowing the Trustee to recover the value of such avoidable transfers from Defendants.

## COUNT XII

### Against the Debtor and Marina for Damages for Violation of the Automatic Stay

279.     Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

280.     On or about February 21, 2009, the Debtor and Marina entered into a "Settlement Agreement and Mutual Release" (the "Settlement Agreement") with Sergey Naumovsky ("Serge").

281.     The Settlement Agreement improperly provides among other things, for a release of Serge by the Debtor and is not limited only to those claims by the Debtor against Serge which were exempted by the Debtor on his Statements and Schedules. (While a "covenant not to sue" contained in the Settlement Agreement recognizes certain the rights of the Trustee, the general release does not recognize any such rights).

282.    In return for consideration purportedly being given by Marina and the Debtor, Marina and the Debtor, as part of the Settlement Agreement, obtained an agreement by Serge to settle, discontinue and end a certain fraudulent conveyance action brought by Serge pre-petition.  The pre-petition action was the result of Serge's claim against the Debtor which, upon information and belief, was assigned pre-petition by Serge to Andrew Mogilyensky.  (Under the Settlement Agreement, said assignment to Andrew Mogilyensky is purportedly revoked).

283.    The fraudulent conveyance action brought by Serge, as an alleged creditor of the Debtor's estate against third parties, constituted property of the estate as of the filing of the Debtor's bankruptcy petition.  In any event, said action is subject to the automatic stay.

284.    To the extent that the Debtor and Marina induced Serge to withdraw said action under the Settlement Agreement this constitutes an intentional violation of §362 of the Bankruptcy Code.  Accordingly, the Trustee requests judgment in her favor against the Debtor and Marina declaring them in contempt of the Bankruptcy Code and entitling the Trustee to compensatory and punitive damages, costs and attorneys fees and such other relief as the Court believes appropriate.

## COUNT XIII

### Against All Defendants for the Imposition of a Constructive Trust

285.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

286.    As an additional claim and remedy, Trustee seeks the imposition of a constructive trust on all assets and things of value, of any kind or description which were improperly diverted from the estate or transferred by Debtor or others.

287.    In addition to damages, the Trustee seeks payment and return to the Trustee of all profits or assets acquired by any of the defendants through use of the funds or assets on which a constructive trust has been imposed.

## COUNT XIV

### Against All Defendants for Relief Asserted in the Other Counts of this Complaint as May Be Determined By the Results of the Accounting

288.    Trustee repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully rewritten herein.

289.    On information and belief, as set forth above, Debtor was in possession of $750,000 in 2003 through Fox Lake Management LLC, LLC (¶¶ 54, 61); was in possession of cash in the amount of $411,000 between March 2005 and April 2007 (¶83) and had the power to transfer $550,000 on deposit in an account in February 2007 (¶81). On information and belief, Debtor had other concealed assets which he may have retained or transferred.

290.    On information and belief, most of Debtor's disclosed transfers were to the family, friends, and related business entities named as defendants in this complaint.

291.    On information and belief, the accounting requested in Count I will disclose other transfers actionable under the other Counts of this Complaint.

292.    Trustee repeats and realleges each and every claim for relief contained in Counts I through XI and Count XIII of this Complaint as if fully rewritten herein.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, the Chapter 7 Trustee of the Estate of Len Polichuk, a/k/a Leonid Polichuk, demand judgment in her favor and against Defendants, Leonard Polichuk, Marina Ayzenberg, Joseph Ayzenberg, Lena Polnet, Larissa Labed, Andrew Nechiporenko (a/k/a) Andrew Polnet, Fox Lake Realty Management, LLC, Metro Development LLC, LAML Management, Inc., Fox Lake Realty Limited Partnership, Marina Reinsurance, Motostrada, LLC, New Century Rehabilitation LLC, Grey Hound Properties, Letterly Realty, Steven Kravits, Steven Rutaky, Dynamic Funding, John Does 1 to 10 and John Doe Corporations and/or Partnerships 1 to 10, and that the Court award the Plaintiff the following relief:

(i.)   The entry of an order in favor of the Plaintiff and against the Defendants, Ordering Defendants to provide a full and complete accounting, with supporting documentation, of all funds, benefits and services received directly or indirectly by or for the benefit of any or all Defendants, including those paid to other entities the Defendant(s) controlled or in which the Defendant(s) had an interest, with the name and amount of each transaction, the entity or individual(s) that withdrew or were paid the funds, and the ultimate use or disposition of the funds or other things of value for the time period referenced herein;

(ii.)   The entry of judgment favor of the Plaintiff and against the Defendants, pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code avoiding the Transfers; directing that the Transfers be set aside; and recovering the Transfers of the value thereof for the benefit of the Debtor's estate;

(iii.)   The entry of judgment in favor of the Plaintiff and against Defendants, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code avoiding the Transfers, directing that the Transfers be set aside, and recovering the Transfers, or value thereof, from the Defendants for the benefit of the estate of the Debtor.

(iv.)   The entry of judgment in favor of the Plaintiff and against Defendants, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code avoiding the Transfers, directing that the Transfers be set aside, and

recovering the Transfers, or value thereof, from the Defendants for the benefit of the estate of the Debtor;

(v.)     The entry of judgment in favor of the Plaintiff and against Defendants, pursuant to section 544, 550(a), 551, 1107 and 12 Pa. C.S. §5104, of the Bankruptcy Code avoiding and preserving the Transfers, directing that the Transfers be set aside, and recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of the Debtor;

(vi.)    The entry of judgment in favor of the Plaintiff and against Defendants, pursuant to section 544, 550(a), 551, 1107 and 12 Pa. C.S. §5105, of the Bankruptcy Code avoiding and preserving the Transfers, directing that the Transfers be set aside, and recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of the Debtor;

(vii.)   The entry of judgment in favor of the Plaintiff and against Defendants, awarding damages on behalf of Plaintiff as a result of a willful and knowing violation of, *inter alia*, 11 U.S.C. 548(a)(1)(A) and (B), 11 U.S.C. §§544, 12 Pa.C.S. §5104, 12 Pa.C.S. §5105 in an amount this court deems equitable and just for each violation;

(viii.)  The entry of judgment in favor of the Plaintiff and against the Defendants, for the value of the property converted in an amount to be determined after appropriate accounting is made;

(ix.)    The entry of judgment in favor of the Plaintiff and against the Defendants, for the value of the Debtor's assets, resources and/or services as set forth herein by which the Defendants have been unjustly enriched; such an amount to be determined after appropriate accounting is made;

(x.)     The entry of judgment in favor of the Plaintiff and against the Defendants, pursuant to 11 U.S.C. §542, directing Defendants to immediately turnover the property, or pay the equivalent value thereof, to the Plaintiff;

(xi.)    The entry of an order declaring that the value of the transfers avoided pursuant to Sections 544, 547, and/or 548, are property of the estate and that the Trustee is entitled to recover for the benefit of the estate of the Debtor the value of such avoidable transfers.

(xii.)   The entry of judgment in favor of Plaintiff and against Defendants Len Polichuk and Marina Ayzenberg finding that said Defendants' actions, as described above, are willful violations of the Automatic Stay violation of the automatic stay pursuant to 11 U.S.C. § 362 and are, thus, null and void; for punitive damages for the willful violations of the Automatic Stay provisions of Title 11; for punitive damages in amount deemed appropriate per occurrence of violation of the Automatic Stay;

1296236-13                          52

(xiii.)    The entry of an order declaring that a constructive trust is thereby imposed on all assets and things of value, of any kind or description, which were improperly diverted from the Debtor's estate or transferred by Debtor or others;

(xiv.)    The entry of judgment in favor of Plaintiff and against Defendant's interest in the maximum amount permitted by law from the date of the Transfers to the date on which the judgment is satisfied by the Defendants;

(xv.)    Attorney's fees and costs; and

(xvi.)    Such other and further relief as is just and proper.


Respectfully Submitted,

**McELROY, DEUTSCH MULVANEY & CARPENTER LLP**


/s/Gary D. Bressler
Gary D. Bressler, Esquire
Christin E. Deacon, Esquire
1617 JFK Blvd. Suite 1500
Philadelphia PA 19023-1815
Phone: (215) 557-2900
Facsimile: (215) 557-2990
*Counsel to the Chapter 7 Trustee*




Michael S. Waters, Esquire
McELROY, DEUTSCH MULVANEY &
CARPENTER LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102-4079
Phone: (973) 622-7711
Facsimile: (973) 622-5314
*Of Counsel to the Chapter 7 Trustee*




1296236-13                                    53