## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| LEN POLICHUK | : | |
| a/k/a LEONID POLICHUK, | : | Bky. No. 08-10783 ELF |
| | : | |
| Debtor. | : | |
| _____ | : | |
| BONNIE FINKEL, as Chapter 7 Trustee | : | |
| of the Estate of Leonard Polichuk, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adv. No. 10-031 |
| | : | |
| v. | : | |
| | : | |
| LEN POLICHUK | : | |
| a/k/a LEONID POLICHUK, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

# O P I N I O N

## TABLE OF CONTENTS

I. INTRODUCTION

II. PROCEDURAL HISTORY

III. GENERAL FACTUAL BACKGROUND

IV. LEGAL STANDARDS: FRAUDULENT TRANSFER

    A. Overview

    B. Badges of Intentional Fraud

**C.  Constructive Fraud**

**D.  Statute of Limitations**


**V.  LEGAL STANDARDS: SUMMARY JUDGMENT**

**A.  Well-Established General Principles**

**B.  The Movant's Burden to Establish that a Non-Movant Who Has the Burden of
Proof Lacks Evidence to Support an Essential Element of the Claim**


**VI.  THE NON-DEBTOR DEFENDANTS' MOTION**

**A.  Law of the Case**

**B.  Wielding the IRS' Power to Tax**

**C.  Creditor Status of IRS**


**VII.  ANDREW'S MOTION**

**A.  207 Elbridge Street**

**B.  415 Worthington Mill Road**

**C.  Fox Lake Realty**


**VIII.  LENA'S MOTION**

**A.  Transfer of the Debtor's Alleged Interest in Fox Lake Realty LP**

**B.  The Bank of America Account Transfers**

**C.  The Motostrada Claim**

**D.  The New Century Claim**

**E.  207 Elbridge Street**

IX.   **LARISA'S MOTION**

   **A.  The 7348 Schwab Account**

   **B.  The 0707 Delaware Account**

X.    **FLR'S MOTION**

XI.   **CONCLUSION**

## I.  INTRODUCTION

In this adversary proceeding, Plaintiff Bonnie Finkel, the Chapter 7 Trustee ("the Trustee") contends that Debtor Len Polichuk ("the Debtor") orchestrated a massive scheme to fraudulently transfer his assets to members of his family and entities that they controlled.  In her Amended Complaint, the Trustee asserts twelve (12) claims seeking to avoid numerous asset transfers, going as far back as ten (10) years prior to the commencement of the Debtor's bankruptcy case.  The 368-paragraph Amended Complaint named seventeen (17) defendants, including five (5) close relatives of the Debtor:  Marina Ayzenberg, Joseph Ayzenberg, Lena Polnet, Larissa Lebed and Andrew Nechiporenko (collectively, "the Polichuk Family Group").  Presently, the litigation remains active against fifteen (15) of the original defendants.[1]

The chart below identifies the remaining defendants with respect to each of the Trustee's claims.

---

[1]     By agreement, two defendants have been dismissed from the proceeding: Steven Kravits and Steven Rubakh.  (See Doc. #'s 131, 503).  The Trustee has obtained a default judgment as to liability only against three (3) defendant entities.  Fox Lake Management LLC, Marina Reinsurance and New Century Rehabilitation LLC.  (See Doc. # 28).

| | Nature of Claim | Defendants |
|---|---|---|
| I | Accounting, Repayment of Funds & Imposition of Constructive Trust | (1)    Debtor<br>(2)-(6) Polichuk Family Group<br>(7)    Metro Developments, LLC<br>(8)    LAML Mangement, Inc.<br>(9)    Fox Lake Realty Ltd. Partnership<br>(10)   Motostrada, LLC<br>(11)   Grey Hound Properties, LLC<br>(12)   Letterly Realty<br>(14)   John Does 1-10<br>(15)   John Doe Corporations or Partnerships 1-10 |
| II | Preference - §547(b) | (1)    Joseph Ayzenberg, |
| III | Fraudulent Transfer - §§548(a)(1)(A), 550 & 551 | (1)-(5) Polichuk Family Group<br>(6)    Metro Development LLC<br>(7)    Motostrada LLC<br>(8)    Grey Hound Properties, LLC<br>(9)    Letterly Realty |
| IV | Fraudulent Transfer - §§548(a)(1)(B), 550 & 551 | same as Count III |
| V | Fraudulent Transfer -  §§544, 550(a), 551, 1107 and 12 Pa. C.S. §5104 | same as Count III |
| VI | Fraudulent Transfer -  §§544, 550(a), 551, 1107 and 12 Pa. C.S. §5105 | same as Count III |
| VII | Conversion | All Defendants (except Debtor) |
| VIII | Turnover of Property of the Estate - §542 | (1)    Debtor<br>(2)    John Does 1-10<br>(3)    John Doe Corporations or Partnerships 1-10 |
| IX | Recovery of Property - §550 | All Defendants |
| X | Violation of the Automatic Stay - §362 | (1)    Debtor<br>(2)    Marina Azyenberg |
| XI | Avoidance of Post-Petition Transfer - §§549, 550, 551 | (1)    Marina Azyenberg |
| XII | Imposition of Constructive Trust | All Defendants |

On August 29, 2013, the five (5) Defendants listed below filed motions for summary judgment or partial summary judgment (collectively, "the Motions"):[2]

> (1) all of the Non-Debtor Defendants ("the Non-Debtor Defendants' Motion") (Doc. # 564);[3]
>
> (2) Lena Polnet ("Lena's Motion") (Doc. # 562);
>
> (3) Andrew Nechiporenko ("Andrew's Motion") (Doc. # 566); and
>
> (4) Larisa Lebed ("Larisa's Motion") (Doc. # 568);[4]
>
> (5) Defendant Fox Lake Realty ("FLR") (Doc. # 570).

For the reasons set forth below, the first motion listed above, the Non-Debtor Defendants' Motion, will be denied. Lena's, Andrew's and Larisa's Motions will be granted in part and denied in part. The fifth motion, the FLR Motion, will be granted in part and deferred in part.

---

[2]    The Debtor has purportedly "join[ed] in the substance of the arguments made in" the Motions, but has not filed any motion seeking any relief. (See Doc. # 574). Therefore, it is unnecessary to enter an order affecting any of the claims raised against the Debtor.

[3]    I will refer to all of the Defendants other than Debtor Len Polichuk collectively as "the Non-Debtor Defendants."

[4]    Ms. Lebed is identified on the court docket as "Larisa Labed," the same spelling of her last name in the caption of the Trustee's original Complaint. The Trustee changed the spelling of her last name in her Amended Complaint to "Lebed." In her Motion, her counsel spells Ms. Lebed's first name as "Larisa," not "Larissa." I will use the same spelling as her counsel.

## II.  PROCEDURAL HISTORY

The procedural history may be summarized concisely as follows.

The Debtor filed a voluntary petition under chapter 7 on January 31, 2008.  The Trustee commenced this adversary proceeding by filing a Complaint on January 29, 2010.

The Non-Debtor Defendants and the Debtor filed motions to dismiss the original Complaint, which was granted in part and denied in part on November 23, 2010.  The Trustee filed an Amended Complaint on January 14, 2011.  After a Motion to Dismiss the Amended Complaint was granted in part and denied in part on July 1, 2011, the Non-Debtor Defendants against whom a default judgment as to liability had not been entered, see n.1 supra, and the Debtor filed their Answers to the Amended Complaint on July 21 and July 22, 2011 respectively.

Once the pleadings closed, the court entered an initial pretrial order on July 28, 2011.  Since then, completion of pretrial discovery has been delayed by: (1) an unsuccessful attempt to achieve a mediated settlement; (2) the parties' eventual, joint recognition that the broad scope of the claims asserted required a substantial amount of discovery; and (3) a series of discovery disputes, several of which necessitated hearings and court rulings.  As a result, I have extended the pretrial deadlines on several occasions, usually by agreement and joint request of the parties.

Pursuant to Pretrial Order # 9, discovery concluded on August 8, 2013.  The Motions were filed on August 29, 2013.  The Movants and the Trustee filed memoranda and reply memoranda, the last of which was submitted on October 18, 2013.

## III. GENERAL FACTUAL BACKGROUND

By way of introduction and to provide some context to the discussion that follows, I will set out a few background facts that are not in dispute. The facts more closely related to the summary judgment motions will be discussed later in the Opinion.

The Debtor was trained as an engineer in Russia. After coming to the United States in 1989, he held a number of jobs at different companies including working as a computer programmer for the Taj Mahal Casino and as a programmer for CIGNA. The Debtor also was involved in a number of businesses including pharmacies and health care facilities before embarking, from about 1999 until late in 2003, on ownership and management of automobile dealerships, along with a partner, Serge Naumovsky. During this time period, the Debtor also set up a company called Marina Reinsurance, to sell warranty insurance policies to the auto dealership customers. In 2003, the Debtor sold his interest in the dealerships to another individual, Nicholas Reinhart.

The balance of the factual matter in this adversary proceeding revolves around various transfers of or from: (1) real estate; (2) businesses and (3) financial accounts, in which the Debtor is alleged to have had some type of ownership interest. The other parties in these transactions are members of the Debtor's family or businesses those family members own or control. The family members are:

(1) Marina Ayzenberg ("Marina"), who is alleged to be the Debtor's spouse (a material fact that is contested by the Trustee, see Part VII.B.3, infra);

(2) Joseph Ayzenberg, ("Joseph"), who is Marina's father;

(3) Lena Polnet ("Lena"), who is the Debtor's sister;

     (4)  Larisa Lebed ("Larisa"), who is the Debtor's sister; and

     (5)  Andrew Nechiporenko, a/k/a Andrew Polnet ("Andrew"), who is the
          Debtor's putative brother-in-law (married to Lena).

Many of the transactions occurred after the Debtor divested himself of his interest in the automobile dealerships.  The Trustee maintains that this is no coincidence.  She believes that the Debtor had substantial liabilities arising from the auto dealership operations and had a strong incentive to insulate his remaining assets from creditor claims.  Thus, she depicts the numerous insider transactions that took place as a web of fraudulent transfers, purposely designed to hinder and delay creditors.[5]  In response, the Debtor and the Non-Debtor Defendants contend that the transactions at issue (a) were designed to permit the Debtor's family to control his business interests and assets at a time when he was hospitalized with a psychological condition rendering him incapable of handling his affairs (the Trustee disputes this) or (b) otherwise were legitimate business transactions.

## IV.  LEGAL STANDARDS: FRAUDULENT TRANSFER

Most of the Trustee's claims derive from her contention that particular transactions are avoidable as fraudulent transfers.  Therefore, it is helpful to set out, briefly, the legal standards that apply to these claims.

---

[5]    When the Debtor filed this bankruptcy case, he presented himself as having virtually no assets.  After the U.S. Trustee filed a complaint objecting to his discharge under 11 U.S.C. §727(a)(2), (3), (4)(A) and (5), the Debtor waived his chapter 7 discharge pursuant to 11 U.S.C. §727(a)(10).  (See Adv. No. 08-0336, Doc. #'s 3, 58).

-8-

## A. Overview

The Trustee's fraudulent transfer claims arise under two provisions of the Bankruptcy Code. The first is the Code's fraudulent transfer provision,11 U.S.C. §548(a)(1).[6] The second is the Code's transfer avoidance provision which allows the bankruptcy trustee to stand in the shoes of an actual creditor who may avoid a transfer under applicable nonbankruptcy law, 11 U.S.C. §544(b).[7] With respect to the §544(b) claim, the Trustee invokes the Pennsylvania Uniform

---

[6]     11 U.S.C. §548(a)(1) provides that a trustee may avoid certain transfers if the debtor

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)
(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)
(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

[7]     Section 11 U.S.C. §544(b)(1) provides:

Except as provided in paragraph (2), the trustee may avoid any transfer of an
(continued...)

Fraudulent Transfer Act, 12 Pa. C.S. §§5101-5110 ("PUFTA") as the applicable nonbankruptcy law.[8]

The Trustee asserts two (2) distinct fraudulent transfer theories of liability.  First, she asserts that the Debtor's asset transfers were intentionally fraudulent, i.e., motivated by an intent to hinder and delay creditors.  Second, she asserts that the transfers were "constructively fraudulent," i.e., regardless of the Debtor's intent, he did not receive reasonably equivalent value in return for the asset transferred.  See In re Daniels, 304 B.R. 695, 711 (Bankr. E.D. Pa. 2003).

Both legal theories are cognizable under 11 U.S.C. §548(a)(1)(A) and (B) and PUFTA. See, e.g., In re Blatstein, 192 F.3d 88, 96 (3d Cir. 1999); Spitko, 2007 WL 1720242 at *15; In re Dawley, 2005 WL 2077074 , at *4 (Bankr. E.D. Pa. Aug. 10, 2005); In re Dolata, 306 B.R. 97, 115 (Bankr. W.D. Pa. 2004).

---

[7](...continued)

> interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

I note that even though the trustee's claim under §544(b) derives from a claim held by an individual creditor, once the trustee undertakes the avoidance action, any recovery inures to the benefit of all creditors.  E.g., In re Victor Intern., Inc., 278 B.R. 67, 84 n.24 (Bankr. D.N.J. 2002); see also In re PWS Holding Corp., 303 F.3d 308, 314 (3d Cir. 2002) ("§544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate").

[8]     In this Opinion, I will refer to 11 U.S.C. §544(b) and PUFTA interchangeably.

### B.  Badges of Intentional Fraud

It is well-established that a transferor rarely will admit that the transfer was motivated by the requisite intent to hinder, delay or defraud creditors.  Courts may infer a defendant's actual intent from circumstantial evidence commonly referred to as "badges of fraud."

Under 11 U.S.C. §548(a)(1)(A), these badges (or indicia) of fraud include consideration whether:

(1)   the transfer or obligation was to an insider;

(2)   the debtor retained possession or control of the property transferred after the transfer;

(3)   the transfer or obligation was disclosed or concealed;

(4)   before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)   the transfer was of substantially all the debtor's assets;

(6)   the debtor absconded;

(7)   the debtor removed or concealed assets;

(8)   the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)   the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

-11-

See, e.g., American Rehab. & Physical Therapy, Inc., 2006 WL 1997431, at *15-16 (Bankr. E.D.

Pa. May 18, 2006); accord Spitko, 2007 WL 1720242, at *12-13.

The "actual fraud" provision of PUFTA is 12 Pa. C.S. §5104(a)(1).[9]  A set of indicia of

fraud, similar to those employed under 11 U.S.C. §548, are codified in PUFTA.  See 12 Pa. C.S.

§5104(b).

Ultimately, under both the Bankruptcy Code and PUFTA, the determination whether the

transfer was made with fraudulent intent is a question of fact that is rarely susceptible to

resolution at the summary judgment stage.  See, e.g., In re Jogert, Inc., 950 F.2d 1498, 1504 (9th

Cir. 1991); see also Schreiber v. Kellogg, 50 F.3d 264, 266 n.3 (3d Cir. 1995) (referring to

Pennsylvania law).


### C.  Constructive Fraud

For a constructive fraud claim, section 548(a)(1)(B) of the Code requires the Trustee

establish that:

> (1)    the debtor had an interest in the property;
>
> (2)    the interest was transferred within two years of the filing of his bankruptcy
>        petition;
>
> (3)    the debtor received less than equivalent value in exchange for the transfer;
>        and

---

[9]        12 Pa.C.S. §5104(a)(1) provides:

> A transfer made . . .  by a debtor is fraudulent as to a creditor, whether the
> creditor's claim arose before or after the transfer was made  . . .  if the debtor
> made the transfer  . . .  with actual intent to hinder, delay or defraud any creditor
> of the debtor[.]

    (4)   either:

        (i)   the debtor was insolvent at the time of the transfer; or

        (ii)  became insolvent as a result thereof; or

        (iii) intended to incur, or believed that he would incur, debts that
would be beyond his ability to pay them as they became matured.

See, e.g., Dawley, 2005 WL 2077074, at *14.

The comparable sections of PUFTA are 12 Pa. C.S. §§5104(a)(2) and 5105.

Section 5104(a)(2) applies to creditors whose claims arose either before or after the

transfer and provides that a transfer for less than reasonably equivalent value is fraudulent if the

debtor:

        (i)   was engaged or was about to engage in a business or a transaction for
which the remaining assets of the debtor were unreasonably small in
relation to the business or transaction; or

        (ii)  intended to incur, or believed or reasonably should have believed that
the debtor would incur, debts beyond the debtor's ability to pay as they
became due.

In contrast, section 5105 applies only to creditors whose claims arose before the transfer

and provides that a transfer is fraudulent

if the debtor made the transfer or incurred the obligation without receiving a
reasonably equivalent value in exchange for the transfer or obligation and
the debtor was insolvent at that time or the debtor became insolvent as a
result of the transfer or obligation.

12 Pa. C.S. §5105.

### D.  Statute of Limitations

### 1.

The statute of limitations has been a highly contested issue in this case.

Under 11 U.S.C. §548(a)(1), as a general rule, the Trustee may avoid only those transfers "made or incurred on or within 2 years before the date of the filing of the [bankruptcy] petition."[10]

Under 11 U.S.C. §544(b), there are two (2) limitations periods that must be considered.

First, §546(a)(1)(A) of the Bankruptcy Code governs the limitation period in this case. Section 546(a)(1)(A) requires that the trustee commence the avoidance action within two (2) years of the order for relief.  There is no dispute that this adversary proceeding was timely filed under §546(a)(1)(A).

Second, it is necessary to evaluate whether the applicable nonbankruptcy avoidance law statute of limitations expired as of the commencement bankruptcy case because the Trustee is

---

[10]      In some circumstances, the date of the transfer may be later than the date of the consummation of the transaction (and therefore, captured by the two (2) year lookback). 11 U.S.C. §548(d)(1) provides:

> For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

See also See 5 Collier on Bankruptcy ¶548.09[1][a] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2010).

invoking the avoidance powers of an actual creditor pursuant to §544(b).   If so, the Trustee's

claims are subject to that limitations defense.

Under PUFTA, there are two (2) potentially applicable limitations periods.   For

constructive fraud claims, the plaintiff is limited to a four (4) year lookback period.   See 12 Pa.

C.S. §5109(2).   For claims based on actual fraud, the lookback period potentially is longer: the

plaintiff may avoid transactions going back four (4) years prior to the filing of the complaint or

"within one year after the transfer or obligation was or could reasonably have been discovered."

12 Pa. C.S. §5109(1).


## 2.

At the outset of this litigation, the Non-Debtor Defendants asserted that most of the

transfers referenced in the original Complaint were beyond all of the PUFTA "lookback" periods.

(Motion to Dismiss Original Complaint, Doc. # 17).   By order dated November 23, 2010 (Doc. #

61), I rejected their argument, reasoning as follows:

> [T]he Trustee's Complaint sets forth facts which, if proven, may result in the
> application of a different, even longer reachback period than the four year period
> provided in 12 Pa.C.S. §5109. Under 11 U.S.C. §544(b), the Trustee may use the
> statute of limitations available to any actual creditor of the debtor as of the
> commencement of the case. E.g., In re Greater Southeast Community Hosp. Corp.
> I, 365 B.R. 293, 301-02 (Bankr. D.D.C. 2006); In re Porras, 312 B.R. 81, 97
> (Bankr. W.D. Tex. 2004). Here, the Trustee has alleged that the United States,
> specifically the Internal Revenue Service . . .  was an actual creditor of the Debtor
> at the time the transfers at issue occurred and has pleaded additional facts which,
> if proven, support the allegation. . . .   The IRS has at least a ten year lookback
> period, see 26 U.S.C. §§6501, 6502, and its rights supersede any statute of
> limitations under state law. See, e.g., U.S. v. Summerlin, 310 U.S. 414, 416
> (1940); United States v. Gleneagles Investment Co., Inc., 565 F.Supp. 556, 583
> (M.D. Pa. 1983), aff'd. sub. nom., United States v. Tabor Court Realty Corp., 803
> F.2d 1288 (3d Cir. 1986), cert. denied, McClellan Realty Co. v. United States, 483

U.S. 1005 (1987). Because the Trustee may step into the shoes of the IRS, she
may seek to avoid transfers that occurred as far back as January 31, 1998.

 The Responding Non-Debtor Defendants contend that <u>Summerlin</u> and its
progeny are distinguishable because 12 Pa.C.S. §5109 is a statute of repose, not a
statute of limitation. However, that argument has been rejected by almost every
court that has considered the issue. <u>See</u> <u>Bresson v. C.I.R.</u>, 213 F.3d 1173, 1178-79
(9th Cir. 2000); <u>U.S. v. Spence</u>, 242 F.3d 392, at *3 (10th Cir. 2000) (Table);
<u>Porras</u>, 312 B.R. at 97. I will follow the apparent judicial consensus on this issue.

<u>In re Polichuk</u>, 2010 WL 4878789, at *3 (Bankr. E.D. Pa. Nov. 23, 2010), <u>leave to appeal denied</u>,

2011 WL 2274176 (E.D. Pa. June 8, 2011).[11]

 Based on this ruling and the same ruling on the Non-Debtor Defendants' Motion to

Dismiss the Amended Complaint, (<u>see</u> Doc. # 137), I permitted the Trustee during pretrial

discovery to examine transactions by and among the Debtor and the Non-Debtor Defendants

going back to the late 1990's for two (2) distinct purposes: (1) proving that the Debtor failed to

pay all of his federal income taxes, thereby giving rise to an IRS claim that will allow the Trustee

to invoke the IRS' enhanced limitations period for setting aside fraudulent transfers;[12] and (2)

proving that avoidable fraudulent transfers occurred.

---

[11] The Trustee also argued that the transfers at issue were all based upon intentional, rather
than constructive fraud, and that her action was brought within the one (1) year "discovery" period
provided by 12 Pa. C.S. §5109.  In denying the Motion to Dismiss, I did not decide that question.

[12] Specifically, the Trustee contends that, as of the commencement of this bankruptcy case,
the Debtor owed a tax debt to the IRS in the amount of $249,435.00, based on unreported, taxable,
non-dividend distributions in the years 2000, 2002 and 2003 and improperly recognized loss deductions
in 2000 and 2002, all derived from his interest in the subchapter-S corporation, Auto Planet, Inc.  (<u>See</u>
Order dated September 26, 2013, slip op. at 3) (Doc. # 594).

## V.  LEGAL STANDARDS: SUMMARY JUDGMENT

### A.  Well-Established General Principles

The legal standard for the entry of summary judgment under Fed. R. Civ. P. 56, incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056, is well established.

Summary judgment is appropriate only when, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  E.g., Tri-M Group, LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011); In re Bath, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  In other words, summary judgment may be entered if there are no disputed issues of material fact and the undisputed facts would require a directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

In evaluating a motion for summary judgment, the court's role is not to weigh the evidence, but to determine whether there is a disputed, material fact for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is one in which sufficient evidence exists that would permit a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248.  In evaluating the record, the court must view the underlying facts and make all reasonable inferences therefrom in the light most favorable to the party opposing the motion.  Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir. 2013); United States v. 717 South Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).  On the other hand, if it appears that the evidence "is so one-sided that one party must prevail as a matter of law," the court should enter judgment in that party's favor.  Anderson, 477 U.S. at 252.

Proper resolution of a motion for summary judgment also requires consideration of the parties' respective burdens.

As a threshold matter, the moving party's initial burden is to demonstrate that there are no disputed issues of material fact.  E.g., U.S. v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987).  How the movant meets this burden and how the respondent may rebut the movant's showing is affected by the allocation of the evidentiary burden of persuasion if the dispute were to proceed to trial.

If the moving party bears the burden of proof, the movant must "support its motion with credible evidence  .  .  .  that would entitle it to a directed verdict if not controverted at trial." Fitzpatrick, 2 F.3d at 1115 (citation omitted).  The evidence must establish "all the essential elements of its case on which it bears the burden of proof at trial, [such that] no reasonable jury could find for the non-moving party."  Id. (citation omitted); see also Bath, 442 B.R. at 387.  If the movant (with the burden of proof at trial) meets this initial burden, the responding party may not rest on the pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material which demonstrate a genuine issue of material fact to be resolved at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson, 477 U.S. at 247-50.

If the moving party does **not** bear the burden of proof at trial, the analysis is more complicated. The movant must still demonstrate the absence of a disputed issue of material fact, but an entitlement to judgment in its favor may be established in either of two (2) ways.[13]

First, and most simply, if the movant (who does not bear the burden of proof) presents evidence establishing that the undisputed facts negate at least one (1) element of the respondent's claim, the movant is entitled to summary judgment. See Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1287 n.5 (D. Utah 1994).

Alternatively, the movant may obtain summary judgment by demonstrating that the responding party (with the burden of proof at trial) lacks evidence to support an essential element of its claim. See, e.g., Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Chipollini, 814 F.2d at 896. How the movant meets the summary judgment burden of demonstrating the absence of evidentiary matter supporting the position of the party with the burden of proof is debated by the parties in this case – more on that in Part V.B., below. However, putting aside for the moment how the movant goes about establishing that the non-movant lacks essential evidence, if the movant does so, the movant is entitled to summary

---

[13]     In this proceeding, the analysis is complicated even further with respect to Counts V and VI, which raise both intentional and constructive fraud claims under 12 Pa. C.S. §§5104 and 5105. As Judge Fox observed in In re Spitko, 2007 WL 1720242, at *4 (Bankr. E.D. Pa. June 11, 2007).

> The allocation of the evidentiary burdens under Pennsylvania law for purposes of [constructive fraudulent transfers] . . . is not clear . . . . Some decisions impose the burden of persuasion upon the plaintiff to demonstrate all of the elements of constructive fraud under PUFTA. Other decisions opine that, in certain instances, there is a shifting of the evidentiary burden back to the transferee to demonstrate reasonably equivalent value. If a fraudulent conveyance is established, then a transferee would have the burden to demonstrate a good faith defense under state law.

judgment.  See Celotex, 477 U.S. at 322 ("[Rule 56] mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial"); see also In re Roemmele, 2011 WL 4804833, at *4

(Bankr. E.D. Pa. Oct. 11, 2011).[14]


**B.  The Movant's Burden to Establish that a Non-Movant Who Has the Burden of
Proof Lacks Evidence to Support an Essential Element of the Claim**

**1.**

As the plaintiff in this adversary proceeding, the Trustee generally bears the burden of

proof on the twelve (12) asserted claims.  In the Motions, the Non-Debtor Defendants regularly

invoke what I characterized above as the "alternative path" to summary judgment.  With respect

to various claims, they assert that the Trustee lacks evidentiary support for essential elements of

the claim.

In response, the Trustee describes the Non-Debtor Defendants' Motions as "an improper

use" of Rule 56 because the Non-Debtor Defendants have not met "the initial burden a movant

must meet in order to shift the burden of persuasion to a non-movant in the summary judgment

context."  (Trustee Mem. at 2).  The Trustee elaborates as follows:

> [The]Non-Debtor Defendants do not cite to the "materials in the record," as
> specifically mentioned in Rule 56 and the cases regarding same. Absent such

---

[14]    Obviously it is not possible for the movant to succeed in this alternative path to summary
judgment if the responding party contests the motion by presenting some evidence in support each
element of its claim.

support, the Non-Debtor Defendants, as the moving parties, have not met their
burden, and thus the burden does not shift to the Trustee.

(Id. at 5).

The Trustee also states, in justification of her position, that she is "confident" that she
will have the necessary evidence when this proceeding gets to trial and that "[t]he appropriate
time for that submission is at trial." (Id. at 3). She suggests that the Non-Debtor Defendants'
Motions are abusive because they are motivated by their desire to compel a "full presentation of
the Trustee's evidence now" due to their failure to conduct adequate discovery. (Id.).

As amplified below, in the circumstances presented in this adversary proceeding, the
Trustee misunderstands her obligation under Rule 56 as the party bearing the burden of proof at
trial. To be blunt, the "appropriate time" for demonstrating that there is evidence that supports
every element of each of the Trustee's claims (in response to the contention that no such
evidence exists) is now, at summary judgment. It is not sufficient for the Trustee to express
"confidence" that she "will be able" to muster evidentiary support for her claims at trial. See
Hahn v. Sargent, 523 F.2d 461, 467 (1ˢᵗ Cir. 1975); Wilson v. Parisi, 549 F. Supp. 2d 637, 654
(M.D. Pa. 2008); Leatherbury v. City of Philadelphia, 1998 WL 47355, at *5 (E.D. Pa. Feb. 4,
1998).

## 2.

Interestingly, the parties' debate regarding a movant's burdens at summary judgment
mirrors the positions of different Supreme Court Justices in the seminal Celotex decision.

In the majority opinion, written by Justice Rehnquist, the Court stated that Rule 56 does not require the party moving for summary judgment to "produce evidence showing the absence of a genuine issue of material fact" with respect to an issue on which the respondent bears the burden of proof.  Celotex 477 U.S. at 325.  Rather, "**the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.**  Id. (emphasis added).  This passage appears to suggest that by representing to the court that the opposing party has developed no evidence to support its burden of proof at trial, the movant can satisfy its initial burden of production.

The dissent quarreled with this point, at least to some degree.  Justice Brennan wrote:

> **Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient**. . . .  Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. . . .  Rather . . .  a party who moves for summary judgment on the ground that the nonmoving party has no evidence **must affirmatively show the absence of evidence in the record**. . . .  This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, **the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party**.

477 U.S. at 332 (Brennan, J., dissenting) (emphasis added, citations omitted).

The primary concern the dissent articulated is that permitting the movant to make the "conclusory assertion" that the nonmovant has no evidence would "permit summary judgment procedure to be converted into a tool for harassment."  Id. at 332.

Muddying the waters a bit is the concurrence of Justice White, the fifth Justice joining the

majority opinion.  Justice White seemed to find some merit in both sides of the debate:

> I agree that **the Court of Appeals was wrong in holding that the moving
> defendant must always support his motion with evidence or affidavits
> showing the absence of a genuine dispute about a material fact**. I also agree
> that the movant may rely on depositions, answers to interrogatories, and the like,
> to demonstrate that the plaintiff has no evidence to prove his case and hence that
> there can be no factual dispute. **But** the movant must discharge the burden the
> Rules place upon him: **It is not enough to move for summary judgment
> without supporting the motion in any way or with a conclusory assertion that
> the plaintiff has no evidence to prove his case**.

Id. at 328 (White, J., concurring) (emphasis added).

The difference between the majority and dissent in Celotex may be more semantics than

substance.  Even the dissent recognized that, in some situations, it may be a logical impossibility

to submit evidence to establish that "no evidence" exists and that the movant's burden can be

met simply "by reviewing for the court" the discovery and communications that have taken place

between the parties.  477 U.S. at 332 (Brennan, J., dissenting).

The state of the law on this subject perhaps is best capsulized by a leading commentator

as follows:

> **The better position is that when a movant contends a nonmovant lacks
> crucial evidence, this factual contention must be supported in the same
> manner as any other factual contention made in a summary judgment
> motion, by reference to disclosure and discovery materials, admissions,
> affidavits or declarations, and the like. The evidentiary support for this
> assertion probably does not have to be thorough and detailed as when a
> movant attempts to show that the facts are undisputed.**  Nonetheless, because
> the rule explicitly requires a "showing," **there must be at least enough
> evidentiary support for the assertion that the nonmovant lacks crucial
> evidence to demonstrate the movant's good faith**.  The nonmovant and the
> court should not face the burdens imposed by a summary judgment when the
> movant has no basis for its assertion.

11-56 <u>Moore's Federal Practice - Civil</u> §56.40[1](b)[iv] (LexisNexis 2013) (emphasis added,

footnotes and citations omitted).


**3.**

      In this case, the Non-Debtor Defendants' assertion that the Trustee lacks crucial evidence

with respect to elements of certain claims has been made in good faith and imposes the burden

on the Trustee to produce evidence in response to the Non-Debtor Defendants' request for

summary judgment.

      This is not the paradigm case in which a party sat back, took no discovery and then filed a

summary judgment motion shortly before trial as a "back-door," belated discovery device, as the

Trustee appears to suggest.  (<u>See</u> Trustee Mem. 2-3).  The discovery that the parties conducted is

well documented in the record by the motions and other filings on the court docket.  The volume

of that discovery has been substantial.  Further, this is not the type of litigation in which the

plaintiff has control or better access to the critical evidentiary sources.  Quite the opposite.  It

appears most of the evidentiary sources in this case are the Non-Debtor Defendants themselves.

Thus, through the process of providing discovery and participating in the third-party discovery

conducted by the Trustee, the Non-Debtor Defendants have had access to the evidentiary matter

the Trustee has attempted to develop in support of the elements of her various claims.  Because

the Non-Debtor Defendants know what evidence the Trustee has developed (at least through

formal discovery), they also are in the position to evaluate whether that evidence, if credited,

makes out the elements of the Trustee's various claims.  And, of course, in representing to the

-24-

court that the Trustee has no evidence on particular issues, they and their counsel are bound by requirements of Fed. R. Bankr. P. 9011.

Nor do I find persuasive the Trustee's suggestion that the Non-Debtor Defendants' Motions constitute an improper attempt to "obtain an outline of [the Trustee's] trial proofs." (Trustee Mem. at 3).  The court's pretrial order in effect when the Non-Debtor Defendants' Motions were filed, (Pretrial Order #9, since modified), set August 29, 2013 as the deadline for filing summary judgment motions.  Under Pretrial Order #9, the deadline for filing a Joint Pretrial Statement  –  which requires a detailed statement of the undisputed facts, the facts in dispute, the identity and a brief summary of the expected testimony of each witness and a list of all exhibits to be offered in the parties' respective cases-in-chief  –  was October 21, 2013.  I fail to see what unseemly tactical advantage the Non-Debtor Defendants could obtain by filing Motions that would require a response in which the Trustee might have to identify the same critical evidence (if it exists) that likely would be disclosed, or at least identified, less than eight (8) weeks later in the Joint Pretrial Statement.  The days of trial by ambush in federal court litigation are long gone.  See generally Mente Chevrolet Oldsmobile Inc. v. GMAC, 728 F. Supp. 2d 662 (E.D. Pa. 2010) (referring to purpose of federal court discovery rules).

In short, in light of the vigorous pre-trial discovery that has taken place and the pervasive specter of Fed. R. Bankr. P. 9011, there is little reason in this case to be concerned that the Non-Debtor Defendants' contention that the Trustee lacks evidence necessary to support elements of various claims is merely a bald, conclusory assertion or is raised in bad faith for purposes of harassment.

The Trustee's position also is unpersuasive in light of her own approach to this litigation. While her Amended Complaint contained sufficient factual detail to survive the Non-Debtor Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), it is also fair to characterize it as being largely a "notice" pleading.  In addition to the concrete factual allegations, it included numerous related, more general allegations of misconduct and constructive fraud, which obviously needed to be developed with greater specificity through discovery.  The Trustee had the benefit of more than one and one-half (1 ½) years of discovery in this adversary proceeding as well as a considerable amount of discovery she conducted pursuant to Fed. R. Bankr. P. 2004 in the main case before she commenced this adversary proceeding.  She also had access to the discovery conducted by the U.S. Trustee in a separate adversary proceeding that resulted in the Debtor's waiver of his chapter 7 discharge.

Given the wide and indefinite swath of the Amended Complaint and the substantial amount of evidentiary matter that the Trustee has obtained over several years, it is not unreasonable to require the Trustee to identify the evidence that she contends refutes the Non-Debtor Defendants' contention that she lacks critical evidence in support of various claims.

As a result, and as set out in more detail below, summary judgment will be entered against the Trustee on certain claims based on the "alternative path" to summary judgment.

-26-

## VI.  THE NON-DEBTOR DEFENDANTS' MOTION

### A.  Law of the Case

The Non-Debtor Defendants seek to defeat the Trustee's claims on transfers made prior to January 31, 2004, again arguing that the statute of limitations expired on those claims.[15]  In particular, the Non-Debtor Defendants claim that the Trustee may not utilize the IRS's extended statute of limitations under PUFTA because PUFTA is a statute of repose, consequently imposing a stricter limitations period.  At the pleading stage, I rejected the Non-Debtor Defendants' statute of limitations argument.  See Part IV.D.(2), supra.

The Non-Debtor Defendants summary judgment arguments largely recycle those made in connection with the two (2) Motions to Dismiss the original Complaint and the Amended Complaint.  Under the law of the case doctrine, the court's prior decision continues to govern the same issue in later stages of the same case.  See In re Pharmacy Benefit Managers Antitrust Litig., 582 F.3d 432, 439 (3d Cir. 2009); see also Benjamin ex rel. Yock v. Department of Public Welfare of Pennsylvania, 701 F.3d 938, 949 (3d Cir. 2012) ("In the absence of extraordinary circumstances, [the court] should generally adhere to its own prior rulings").   To the extent that the Non-Debtor Defendants have repeated their earlier arguments, they have presented no reason to depart from the law of the case.

---

[15]      In asserting an affirmative defense of the statute of limitations, the Non-Debtor Defendants bear the burden of proof on summary judgment.  Moreland v. United States, 2013 WL 3283700, *2 (N.D. Tex. June 28, 2013) ("if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor" (quoting Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986))).

In their latest Motion, however, the Non-Debtor Defendants also articulate several new

legal arguments which, arguably, are based on developments in the administration of the

Debtor's bankruptcy case and events that have occurred since the denial of the Motions to

Dismiss.  I have therefore considered the merits of these new arguments, but, as discussed below,

I find them unpersuasive.


### B.  Wielding the IRS' Power to Tax

The IRS has not filed a proof of claim in this bankruptcy case.  The Non-Debtor

Defendants argue that permitting the Trustee to assert that the Debtor owed pre-petition taxes

which the IRS itself has not claimed, is tantamount to delegating to the Trustee the taxing power

of the federal government.  Respectfully, I disagree.

The Non-Debtor Defendants's argument attacks a strawman.  The Trustee is neither

assessing nor collecting a federal income tax against the Debtor.  Rather the Trustee is stepping

into the shoes of an actual creditor who would be able to avoid the transfers under applicable

nonbankruptcy law and is asserting legal claims that are available to that actual creditor, as is

authorized by 11 U.S.C. §544(b).  Federal income taxes, **assessed or not**, that are due and owing

fall within the concept of a "claim" in bankruptcy.  See In re Heritage Org., L.L.C., 2008 WL

5215688, at *4-5 (Bankr. N.D. Tex. Dec. 12, 2008) ("unassessed tax obligation is a claim that

entitles the United States to set aside a fraudulent transfer under state fraudulent conveyance law"

(citing U.S. v. Thomassen, 610 F. Supp. 386, 391-92 (D. Neb. 1985)); In re Davidson, 156 B.R.

600, 603 (Bankr. E.D. Ark. 1993).  Generally speaking, the IRS is an unsecured creditor that is

able to avail itself of the avoidance provisions of PUFTA and the Trustee may properly use the

-28-

IRS' status as a creditor.[16]  Furthermore, setting aside a transfer is not exercising the

government's taxing authority.  The Trustee is merely using the IRS' status as an entity that holds

a valid claim against the Debtor as of the commencement of the case.  PUFTA does not limit the

type of creditor which may avail itself of its avoidance power.


### C.  Creditor Status of IRS

The Non-Debtor Defendants next argue that the IRS is not an actual creditor holding an

allowable unsecured claim against the Debtor because: (1) the IRS has not assessed any pre-

petition tax debt and (2) the IRS could no longer assess taxes for the relevant time period as of

the commencement of the bankruptcy case because the assessment deadline has expired.


### 1.

The Non-Debtor Defendants' first argument starts from the erroneous premise that the

Debtor's liability for federal income tax is rooted solely on the IRS' assessment of the tax.

It is not the assessment, but the statutory obligation to account for, collect, or pay the tax

due, that gives rise to tax liability.  Edelson v Commissioner, 829 F.2d 828, 834 (9th Cir 1987); In

re Goldston, 1995 WL 41687, at *3 (D. Kan. Jan. 20, 1995), aff'd, 104 F.3d 1198 (10th Cir.

1997); 1-8 Federal Tax Practice and Procedure §8.04 (Matthew Bender 2013) ("Fed. Tax P&P")

("A tax liability arises at the close of the taxable year, regardless of whether the Service assesses

it."); see also In re White, 168 B.R. 825, 831 (Bankr. D. Conn. 1994) ("Even if the debtor filed

---

[16]    The existence of a valid IRS claim is in dispute.  The Trustee will have to prevail on the
issue at trial in order to utilize the IRS' extended statute of limitations.

returns for some of the years in question, the Service's failure to assess does not relieve him from

liability.").

Federal income tax liability arises at the close of the tax year.  Fed. Tax P&P §8.04.

Thus, "[a]ssessment is merely the formal recordation of the liability and, while proper assessment

is required before the Service may use its lien and levy powers to collect the tax, it is not the

assessment that creates the liability."  Id. §8.04.  While an assessment is necessary when the IRS

wishes to proceed administratively, it is axiomatic that an assessment is not a prerequisite to

liability.[17]  Rather, an assessment is a bookkeeping notation of when the Secretary of the

Treasury establishes the account against a taxpayer on the tax rolls.[18]  The assessment merely

places the taxes owed on the books of the Government[19] and provides the procedural gateway for

administratively action to collect the tax liability.  Philadelphia & Reading Corp., 944 F.2d at

---

[17]     See In re Goldston, 104 F.3d at 1200 (10th Cir. 1997) ("The liability . . . here derives
from his statutory duty to pay taxes, not the IRS' assessment of the liability. Abundant precedent exists
for the proposition in a variety of tax contexts that liability for federal taxes does not hinge on whether
the IRS has made a valid assessment."); In re Davis, 936 F.2d 771, 774 (4th Cir. 1991) (citing In re
Hatchett, 31 B.R. 833, 836 (Bankr. E.D. Va. 1983)); Fed. Tax P&P §8.04[2] ("The Service is not
required to assess a tax in order to collect it because assessments do not create tax liabilities; they merely
reflect tax liabilities." (citing Bull v U.S., 295 U.S. 247, 260 (1935)); see also United States v. Siceloff,
451 Fed. App'x. 183, 186-87 n.1 (3d Cir. 2011) (nonprecedential) ("Courts of appeals that have
considered the issue in similar contexts unanimously agree that a tax assessment is not a prerequisite to
liability."); United States v. Latham, 754 F.2d 747, 750 (7th Cir. 1985) (finding that lower court did not
err "in refusing to instruct the jury that an assessment under 26 U.S.C. § 6201 is a legal necessity before
an individual can have an income tax liability"); White, 168 B.R. at 831 ("the Service need not have
made an assessment in order to assert that it has a claim").

[18]     Philadelphia & Reading Corp. v. United States, 944 F.2d 1063, 1065 n. 1 (3d Cir. 1991)
(citing Laing v. United States, 423 U.S. 161, 170 n.13 (1976)); United States v. Biondic, 2003 WL
22765021, at *2 (N.D. Ohio Oct. 29, 2003).

[19]     Rev. Rul. 85-67, 1985-1 C.B. 364 (citing Cohen v. Mayer, 199 F. Supp. 331, (D.N.J.
1961), aff'd sub nom., Cohen v. Gross, 316 F.2d 521 (3d Cir. 1963)).

1065 n. 1; <u>Goldston</u>, 1995 WL 41687, at *3. Indeed, if the IRS has not made an assessment, tax

liability may be established by a judicial proceeding, so long as the applicable assessment period

has not run.  <u>Clark v. United States</u>, 63 F.3d 83, 85 n. 1 (1st Cir. 1995); <u>Fed. Tax P&P</u> §8.04.

Thus, the lack of an assessment does not prevent the IRS from holding a claim which may

serve as the foundation for the Trustee's use of 11 U.S.C. §544(b) to invoke the IRS' extended

statute of limitations.  <u>Heritage Org.</u>, 2008 WL 5215688, at *4-5.


**2.**

As stated in Part IV.D., <u>supra</u>, the Trustee's invocation of the IRS' enhanced statute of

limitations is based on her factual assertion that the Debtor is liable for additional federal income

taxes for tax years 2000, 2002 and 2003.  The Non-Debtor Defendants seek to negate the

Trustee's claim by arguing that the statutory period for assessing any additional income tax

expired prior to the commencement of this bankruptcy case, leaving the IRS with no valid

bankruptcy claim.

Federal tax assessments are governed by 26 U.S.C. §§6201-6207.  Generally, the IRS

must assess a tax liability within three (3) years of the date when the income tax return was filed,

"whether or not such return was filed on or after the date prescribed."  26 U.S.C. §6501(a).  The

Non-Debtor Defendants base their argument that the assessment deadline had expired prior to the

Debtor's bankruptcy filing on the fact that the Debtor filed all required federal income tax returns

for the years prior to the Debtor's 2008 bankruptcy.  By January 2008, when the Debtor filed this

bankruptcy case, the general three (3) year limitation on an assessment for any underpayment of

tax had passed for all of the tax years (2000, 2002 and 2003) on which the Trustee bases her

argument.

The Non-Debtor Defendants are correct that the general three-year assessment period had

run before the commencement of the Debtor's bankruptcy case. However, they incorrectly

assume that the summary judgment record establishes that the Debtor's federal income tax

returns were timely filed. They also assume, incorrectly, that the only applicable limitations

period is the general three-year period under 26 U.S.C. §6501(a).

A review of the exhibits attached to the Non-Debtor Defendants' Motion, does not reveal

unambiguously when the Debtor's 1999 – 2003 federal income tax returns were filed with the

IRS. Nor is it possible to determine whether the Debtor granted the IRS an extension of the

assessment period. The copies of the Debtor's 1999 – 2003 returns attached to the Non-Debtor

Defendants' Motion are not dated (indeed, some are not signed). (See Non-Debtor Defendants'

Ex. 1).[20] Further, the Non-Debtor Defendants attached documents purporting to be IRS "account

transcripts" for the Debtor that appear to indicate that the none of the Debtor's returns for 1999 –

2003 were filed by the respective due date for each taxable year.[21] (See id. Ex. 3). Also, for tax

year 2003, there is evidence that the IRS sent the Debtor a request to extend the time to assess

---

[20]    Hereafter, for brevity's sake, I will refer to the exhibits attached to each Motion by
referencing the movant and the term "Ex." Similarly, I will refer to the exhibits attached to the Trustee's
original Memorandum as "Trustee Ex." and the exhibits attached to her Supplemental Memorandum
"Trustee's Supp. Ex."

[21]    The Non-Debtor Defendants submitted these documents as evidence that the IRS had
abated the Debtor's tax liability in certain years. However, this evidence does not carry the day. Under
certain circumstances, a prior abatement does not affect the IRS' ability to assess an additional tax if the
IRS may still make a valid assessment or collection without assessment. See e.g., In re Becker, 407 F.3d
89, 97 (2d Cir. 2005).

any additional tax liability; however, the record is devoid of evidence whether the Debtor ever

assented to that request.  (See id. Ex. 2).

Based on the above indicia alone, there is an issue of material fact whether the general

three-year period for assessment for the tax years 1999 – 2003 has run pursuant to 26 U.S.C.

§6501(a) because the limitations period is statutorily tied to the date the returns were filed.

Furthermore, based on material facts that are in dispute, a longer limitations period may

be applicable.  26 U.S.C. §6501 provides several exceptions to the general three-year limitations

period.  See e.g., 26 U.S.C. §6501(e) (six-year statute of limitations for 25% understatement of

item of income); 26 U.S.C. §6501(c)(1) (unlimited statute of limitations for false or fraudulent

return); 26 U.S.C. §6501(c)(2) (unlimited statute of limitations for willful evasion of tax).

The Trustee has presented competent evidence that an exception to the general

assessment period may apply that would allow the IRS to have made an assessment for an

additional tax as of the date of the bankruptcy filing.  An expert report by Matthew Tomlin, CPA

("the Tomlin Report"),[22] opines that for tax years 2000 – 2003, the Debtor had additional tax

liabilities of nearly $250,000.00 from unreported non-dividend distributions and improperly

---

[22]    The Trustee relies on the Tomlin Report to establish that the Debtor is liable for an
additional tax derived from some measure of an understatement of income.  Although none of the parties
submitted the Tomlin Report as an exhibit either in support or in opposition to the motions for summary
judgment, it was the subject of the Non-Debtor Defendants' Motion in Limine that was filed
contemporaneously with the summary judgment motions.  (See Motion in Limine, Ex. 3; Doc. #572-5).
In the Motion in Limine, the Non-Debtor Defendants requested that the Tomlin Report be excluded based
primarily upon Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

By Order dated September 26, 2013, I denied the Non-Debtor Defendants' Motion in
Limine.  I found that much of the Non-Debtor Defendants' complaint about the Tomlin Report went to
the weight of the opinion and would be more appropriately addressed at trial. In these circumstances,
particularly its submission to the court contemporaneously with the filing of the summary judgment
motions, I find it appropriate to consider the Tomlin Report as part of the summary judgment record.

-33-

recognized loss deductions from his interests in the automobile dealerships.  The Tomlin Report

also opines that the Debtor used an improper filing status and took improper deductions to gain

an advantage that resulted in less income tax liability for the Debtor during those years.

The Tomlin Report provides adequate evidentiary support to defeat the Non-Debtor

Defendant summary judgment motion.  It constitutes admissible evidence that the Debtor's

federal income tax returns contained a substantial understatement of income or were false or

fraudulent, thereby triggering a longer statute of limitations period, i.e., six (6) years or

unlimited.  Undoubtedly, the Trustee ultimately must prove a wrongful intent for the longer

limitation periods to apply.  See 26 U.S.C. §6501(c)(1), (2).  However, these issues require trial

and factfinding.

Based upon the evidence presented, the Trustee has raised a question of material fact

whether the IRS may still validly assess or establish  without an assessment an additional tax

liability on the Debtor for years prior to the commencement of this bankruptcy case.


**3.**

Lastly, the Non-Debtor Defendants argue that even if the IRS were somehow able to

assess an additional tax or otherwise has a claim against the Debtor, the claim is not allowable

under 11 U.S.C. §502, which defeats the Trustee's authority to invoke §544(b).  The Non-Debtor

Defendants assert that the IRS is not creditor holding an "allowable" claim, within the meaning

of 11 U.S.C. §544(b) because it has not filed a proof of claim.

The Non-Debtor Defendants rely largely on In re Republic Window & Doors LLC, 2011

WL 5975256, at *9-10 (Bankr. N.D. Ill. Oct. 17, 2011), which held that the trustee may not step

into the shoes of the purported creditor until that creditor has filed a proof of claim.  The

Republic Window court in turn relied upon a Seventh Circuit case, In re Leonard, 125 F.3d 543

(7th Cir. 1997).

Curiously, in Republic Window, the court acknowledged that the Seventh Circuit did not

specifically hold that a proof of claim must be filed, yet inferred that a creditor must file a proof

of claim to be allowable under §544(b) based on Leonard's reasoning that a number of unsecured

creditors had filed claims and the trustee could assume the position of any one of them.  Republic

Window, 2011 WL 5975256, at *10.

That critique of its logic aside, Republic Window is not without support.  Other courts

have held that a proof of claim must be filed in order to have an "allowable claim."  See e.g., In

re Wellman, 1998 WL 2016787 (Bankr. D.S.C. June 2, 1998) (only unsecured creditor that filed

a proof of claim has an allowable claim that may be used by the trustee to pursue a §544(b)

claim).

For several reasons, I am persuaded by the rationale given by the courts that reached the

opposite conclusion – that a proof of claim is not a prerequisite to the Trustee's exercise of the

§544(b) avoidance power.

First, the plain language of 11 U.S.C. §544(b) supports this conclusion.  Section 544(b)

references a claim that is "allowable" under §502.  The distinction between the terms "allowed"

and "allowable" in the two Code sections has been noted:

> [A]llowed and allowable do not have the same meaning and a creditor might fail
> to have an allowed claim for reasons that have nothing to do with whether it was
> owed money by the debtor, see 11 U.S.C. §502(b)(1) - (9), (d), including the
> failure to file. When Congress wanted rights to turn on whether a claim had
> actually been "allowed" it said so, see e.g., 11 U.S.C. §§506(a), 1325(a)(4), (5),

> (b)(1), and it did not used that term in §544(b). In order to proceed under
> §544(b)(1) the trustee only needs to identify a creditor holding an allowable claim
> - a creditor that is owed money as of the date of the petition –  not one whose
> claim has actually been allowed.

In re Crown Unlimited Mach., Inc., 2005 Bankr. LEXIS 3073, *3 n. 2 (Bankr. N.D. Ind. Nov. 4,

2005).

Second, section 502(b), which mandates that the court resolve objections to claims by

determining the amount of the claim "as of the date of the filing of the petition," also supports

the conclusion that the Trustee's invocation of §544(b) is not dependent upon the filing of a

proof of claim by the creditor in whose shoes the Trustee seeks to step.  Otherwise, the trustee's

power to assemble a bankruptcy estate for the benefit of all creditors would be subject to

manipulation by parties in interest.  As the Eighth Circuit bankruptcy appellate panel explained:

> The date of the filing of the petition is important because it generally fixes the
> rights of the estate and other parties in interest. Congress and courts commonly
> refer to the date of the bankruptcy petition as the "date of cleavage." . . .  It is
> inconsistent with the Bankruptcy Code to allow a transferee of a fraudulent
> transfer to defeat the bankruptcy trustee by paying a couple of creditors. The
> potential for abuse is obvious.

In re DLC, Ltd., 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003).  In DLC, because the amount of an

allowed claim is determined as of the date of the petition under 11 U.S.C. §502(b), the court used

the petition date to determine whether a creditor had an allowable claim for purposes of §544(b).

Id. (citing In re Acequia, Inc., 34 F.3d 800, 809 (9th Cir. 1994)); accord In re McDowell, 87 B.R.

554, 558 (Bankr. S.D. Ill. 1988).

Further, a creditor's failure to file a proof of claim does not necessarily disrupt its

standing for other purposes within the bankruptcy scheme.  Courts have noted that the filing and

allowance of a proof of claim primarily impacts a creditor's voting and distribution rights.  E.g.,

Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 34

(S.D.N.Y. 2002).  In chapter 11 and chapter 13 cases, the failure to file a proof of claim "does not

extinguish a creditor's status, it merely eliminates a creditor's right to a distribution if the

creditor has not timely filed a proof of claim."  In re Stamford Color Photo, Inc., 105 B.R. 204,

206 (Bankr. D. Conn. 1989) (referring to Fed. R. Bankr. P. 3003(c)(2)); see also In re American

G.I.Forum, 2013 WL 5435633, at *7 (Bankr. N.D. Cal. Sept. 26, 2013); In re Aloia, 496 B.R.

366, 379 (Bankr. E.D. Pa. 2013); In re MF Global Holdings, Ltd., 469 B.R. 177, 188-89 (Bankr.

S.D.N.Y. 2012); In re Jensen, 369 B.R. 210, 229-31 (Bankr. E.D. Pa. 2007).

        Finally, in this chapter 7 case, even if I were to assume that a proof of claim is required to

have an allowable claim, the fact that the IRS has not filed a proof of claim and that the bar date

has passed does not preclude the IRS from having an allowable claim.  Without going through all

the details, 11 U.S.C. §726(a)(3) subordinates late-filed unsecured claims but allows them to

receive a distribution if timely filed claims have been paid in full.  Thus, the IRS is not

foreclosed from filing a proof of claim in the future and may yet be a unsecured creditor with an

**allowable** claim.  See Crown Unlimited, 2005 Bankr. LEXIS 3073, at *6-8; In re Wills, 2008

WL 1840701, at *2 (Bankr. D. Kan. Apr. 23, 2008) (trustee's rights were fixed on the day the

debtors filed for bankruptcy, and were not altered by [creditor's] subsequent failure to file a

timely proof of claim).  If, as is the case here, a creditor is still able to file a proof of claim, courts

have allowed that creditor to act as the triggering creditor for purposes of §544(b).  See e.g., In re

Porter, 2009 WL 902662, *20 (Bankr. D.S.D. Mar. 13, 2009); In re G-I Holdings, Inc., 313 B.R.

612, 635-36 (Bankr. D.N.J. 2004).

For all these reasons, I conclude that the correct approach is to use the petition date to determine whether a creditor has an allowable claim for purposes of 11 U.S.C. §544(b).  Accord In re Rood, 2013 WL 55650, *4 (D. Md. Jan. 2, 2013); MC Asset Recovery, LLC v. Southern Co., 2006 WL 5112612, *3-4 (N.D. Ga. Dec. 11, 2006); Heritage Org., 2008 WL 5215688, at *3-4; In re Kopp, 374 B.R. 842 (Bankr. D. Kan. 2007).  Therefore, the fact that the IRS has not filed a proof of claim in this case, does not prevent the Trustee from using the IRS as the triggering creditor for purposes of 11 U.S.C. §544(b).

## 4.

I conclude that the Non-Debtor Defendants have failed to carry their burden to establish that no material issues of fact remain with respect to their statute of limitations defense under 11 U.S.C. §544(b) and PUFTA.  The Non-Debtor Defendants' Motion therefore, will be denied.

## VII.  ANDREW'S MOTION

The Trustee asserts that Andrew is liable as the recipient of three (3) separate asset fraudulent transfers.[23]  The Trustee appears to assert that the transfers are avoidable under both 11 U.S.C. §548 and PUFTA (applicable through 11 U.S.C. §544(b)).

---

[23]     Andrew interpreted the Amended Complaint as seeking the avoidance of five (5) asset transfers, two (2) of which involved transfers to or from a "Schwab One" account that Andrew and Marina Ayzenberg opened at Charles Schwab ("the 2935 Schwab Account").  However, in her response, the Trustee stated that she is making no claims against Andrew with respect to the "2935 Schwab Account."  (Trustee Mem. at 61-62).

Andrew asserts that he is entitled to summary judgment.  Based on the analysis below of the evidence relating to each transfer, I conclude that Andrew is entitled to summary judgment with respect to one (1) of the three (3) transfers at issue.

## A.  207 Elbridge Street

### 1.

As stated earlier, Andrew is married to the Debtor's sister, Lena.  On July 24, 2002, the Debtor and Lena purchased 207 Elbridge Street, Philadelphia, PA ("the Elbridge Property").  Subsequently, the Elbridge Property was transferred three (3) times:

(1)   By deed dated September 26, 2003 and recorded November 19, 2003, the Debtor and Lena transferred the Elbridge Property to Andrew for a stated consideration of $1.00.  (Andrew Ex. 4).

(2)   On September 30, 2004, Andrew transferred the property back to the Debtor and Lena, again for $1.00 consideration.  (Andrew Ex. 5).

(3)   On June 17, 2005, the Debtor and Lena sold the Elbridge Property to an individual named Elena Kholbystova for $142,000.00.  (Andrew Ex. 6).

At her deposition, Lena testified that she and the Debtor transferred the Elbridge Property to Andrew in November 2003 because he had "made extensive renovations" and was paying "all of the expenses" so that his father could live there.  (Andrew Ex. 2, at 102-04).  Lena explained that the property was deeded back to her and the Debtor in September 2004 because, at the time, Andrew's father had a terminal illness with a poor prognosis.  That illness resulted in his death in January 2005, a few months later.  (Id. at 107-08).  There is no contrary evidence on these points.

Further, there is no evidence regarding the value of the Elbridge Property at the time of the first two (2) transfers (from the Debtor and Lena to Andrew and then from Andrew back to

the Debtor and Lena).  There is no evidence suggesting that the third transfer (the sale by the

Debtor and Lena to Elena Kholbystova) was for less than reasonably equivalent value.


**2.**

In analyzing these series of transfers, Andrew focuses, not surprisingly, on the last two (2)

transfers.  He emphasizes that the September 2004 transfer "reestablished the status quo" as it

existed prior to the September/November 2003 transfer, that there is no evidence that the final

transfer in June 2005 to a non-party was for less than reasonably equivalent value and that there

is no evidence that any creditors were actually hindered or delayed during the 10-12 month

period in which the Debtor did not have title to the property.  (Andrew Mem. at 6).

The Trustee responds in two (2) ways.  First, she points out that Andrew cites no case law

in support of his argument that the transfer of the property back to the Debtor and Lena vitiates

the Trustee's avoidance claim.  (Nor does the Trustee cite any cases on the issue, for that matter).

The Trustee also argues that such a defense should be rejected because it is "plausible" that the

transfer was motivated by the Debtor's interest in placing the asset beyond the reach of his

creditors and because Andrew was an "active participant in this scheme."  (Trustee Mem. at 59-

60).  Presumably, the Trustee is suggesting that even if the re-transfer vitiates a claim based on

constructive fraud, it is not a defense in a case involving a transfer based on an actual intent to

hinder, delay or defraud.

**3.**

The Trustee's §548(a) claim unquestionably is untimely because all of the transfers at issue were publicly recorded and occurred more than two (2) years before the commencement of the Debtor's bankruptcy case.  However, her §544(b) claim arising, as it does, from transfers that were made within ten (10) years of the filing of the bankruptcy case are timely.  See Part VI., supra.[24]  Thus, it is necessary to consider Andrew's contention that re-transfer of the Elbridge Property back to the Debtor in September 2004 defeats the Trustee's PUFTA claim as a matter of law.

There is no Pennsylvania case law that provides any guidance on the issue presented. However, there is case law under the Bankruptcy Code that does.

11 U.S.C. §727(a)(2) provides that a debtor's chapter 7 discharge should be denied if, inter alia, the debtor transfers assets "with intent to hinder delay or defraud a creditor" – the same elements at issue in this adversary proceeding with respect to the Trustee's intentional fraud claim.  A number of courts have considered whether a debtor may salvage his or her discharge by reversing a transfer that was intended to hinder, delay or defraud creditors and that otherwise would result in denial of discharge.

In what is probably the minority view, the Ninth Circuit has suggested a statutory gloss on the term "transfer," which would insulate a debtor who engineers a reversal of a pre-petition fraudulent transfer from the denial of discharge:

---

[24]     Along with the other Non-Debtor Defendants, Andrew contends that the Trustee's complaint is barred by the statute of limitations under PUFTA.  (Non-Debtor Defendants' Mem. at 19). However, as explained in Part VI, supra, I have rejected that argument.

> **reading "transferred" as used in section 727(a)(2)(A) to mean "transferred
> and remained transferred" is most consistent with the legislative purpose** of
> the section. The language of section 727(a)(2)(A) demonstrates that Congress
> intended to deny discharge to debtors who take actions designed to keep their
> assets from their creditors either by hiding the assets until after they obtain their
> discharge in bankruptcy or by destroying them.  The only type of transfer that has
> the effect of keeping assets from creditors is a transfer in which the property
> remains transferred at the time the bankruptcy petition is filed.

In re Adeeb, 787 F.2d 1339, 1344-45 (9th Cir. 1986) (emphasis added, citation omitted).

The Adeeb court's construction of 11 U.S.C. §727(a) arguably is supported by the narrow

construction given to that Code provision.[25]  It also is arguably supported by bankruptcy

discharge policy:  "A debtor who reveals and cures misdeeds falls within the description of 'the

honest but unfortunate debtor who surrenders for distribution the property which he owns at the

time of bankruptcy.'"  In re Bajgar, 186 B.R. 5, 7-9 (Bankr. D. Mass. 1995) (citing Local Loan

Co. v. Hunt, 292 U.S. 234, 244 (1934)), rev'd, 104 F.3d 495 (1st Cir. 1997).  One respected

commentator has endorsed Adeeb's construction of §727(a)(2).  See 6 Collier ¶727.02[5], at 727-

25; see generally In re Vidro, 497 B.R. 678, 689-90 (Bankr. E.D.N.Y. Sept. 26, 2013) (without

adopting Adeeb, denying the debtor's discharge finding that the fraudulent transfer that was

reversed shortly before the bankruptcy filing was **not** the result of poor legal counseling by an

attorney unfamiliar with bankruptcy law and the return transfer was **not** motivated by an intent to

undo a mistake).

It appears, however, that most courts have declined to follow Adeeb, primarily for two (2)

reasons.  First, these courts suggest that the plain language of the statute precludes the

---

[25]     See Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) (§727 is construed "in favor of
the debtor"); accord In re Perez, 411 B.R. 386, 396 (Bankr. D. Colo. 2009) (citing In re Brown, 108 F.3d
1290, 1292 (10th Cir. 1997)); In re Raeder, 409 B.R. 373, 379 (Bankr. N.D. W. Va. 2009).

construction adopted by <u>Adeeb</u> and should be followed.[26]  <u>See, e.g.</u>, <u>In re Davis</u>, 911 F.2d 560,

562 (11th Cir. 1990).  Second, these courts reason that "section 727(a) already encourages

debtors to be honest, or they will not be able to obtain a discharge; additional incentives need not

be judicially created."  <u>Village of San Jose v. McWilliams</u>, 284 F.3d 785, 792 (7th Cir. 2002);

<u>accord</u> <u>In re Berg</u>, 387 B.R. 524, 571 (Bankr. N.D. Ill. 2008).[27]


**4.**

Regardless whether the <u>Adeeb</u> court correctly construed 11 U.S.C. §727(a)(2), and

without expressing any opinion on that precise issue, I find that the rationale for construing the

word "transfer" to mean "a transfer that remains transferred" even more compelling under

§548(a).  One court concisely articulated the reasons for this as follows:

> Although there is no formal "diminution of estate" requirement in the statutory
> language, the purpose of fraudulent transfer recovery is to prevent a debtor from
> putting assets otherwise available to its creditors out of their reach: "In our quest
> to understand fraudulent transfer liability, we often overlook first principles. At its
> core, fraudulent transfer law is a debt-collection device and not a revenue
> generating tool; its mission is to prevent the unjust diminution of the debtor's
> estate."

<u>In re Consolidated Pioneer Mtge. Entities</u>, 211 B.R. 704, 717 (S.D. Cal. 1997) (quoting Jack F.

Williams, <u>Revisiting the Proper Limits of Fraudulent Transfer Law</u>, 8 Bankr. 12 Dev. J. 55, 128

(1991)), <u>partially rev'd on other grounds</u>, 166 F.3d 342 (9th Cir. 1999).

---

[26]     <u>See, e.g.</u>, <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534 (2004); <u>United States v. Ron–Pair
Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989).


[27]     There is no binding precedent in this Circuit on this question of statutory construction
under §727(a).

Many other courts agree that the sole purpose of 11 U.S.C. §548 is to preserve the assets of the estate for the benefit of creditors.  See, e.g., In re Jeffrey Bigelow Design Group, Inc., 956 F.2d 479, 484 (4th Cir. 1992); In re Chase & Sanborn Corp., 813 F.2d 1177, 1181 (11th Cir. 1987); In re Payroll America, Inc., 498 B.R. 252, 257 (D. Idaho 2013); Bear, Stearns Securities Corp. v. Gredd, 275 B.R. 190, 195 (S.D.N.Y. 2002).  Given this purpose, it follows that if the debtor has received the property back, the debtor's estate has not been diminished, creditors have not been prejudiced and there is no reason for the trustee to invoke the avoidance power, regardless whether the debtor must forfeit his or her discharge under 11 U.S.C. §727(a) due to the transfers.

Under the Bankruptcy Code, this limitation on the avoidance power also is expressed in 11 U.S.C. §550(a).  Section 550(a) provides that the bankruptcy estate's sole remedy, after a transfer is avoided, is the recovery of "the property transferred or, if the court so orders, the value of such property."  Similarly, the lead remedy in PUFTA is avoidance of the transfer accompanied by other remedies that are designed to recover the asset by attachment or appointment of a receiver to "take charge" of the asset.  12 Pa. C.S. §5109.  If the estate already has recovered the property (or its value), what reason is there for the trustee (or in a traditional PUFTA action, the creditor) to obtain any further remedy?  That would be a double recovery from the same party, which is not a result that the drafters of the statute could have intended.  See also 11 U.S.C. §550(d) (restricting the trustee "to only a single satisfaction" under [§550](a)).

I find the logic of the limitation on the federal bankruptcy fraudulent transfer avoidance power compelling and predict that the Pennsylvania Supreme Court would reach the same conclusion, i.e., that there is no right to set aside a fraudulent transfer under PUFTA if the

-44-

transferee returns the property to the transferor.[28]   I therefore hold that §544(b) and PUFTA

authorize the trustee to avoid only those transfers that remain transferred pre-petition.  Stated

slightly differently, a fraudulent transfer, otherwise avoidable under §544(b) and PUFTA may not

be avoided if the debtor received the transferred property back from the transferee prior to the

commencement of the bankruptcy case.  As a matter of law, Andrew's pre-petition transfer of the

Elbridge Property back to the Debtor provides a complete defense to the Trustee's fraudulent

transfer claims under 11 U.S.C. §548(a) and PUFTA.[29]

     For these reasons, summary judgment will be entered in Andrew's favor on the Trustee's

fraudulent transfer claim regarding the Elbridge Property.

---

[28]    In applying state law, a federal court must predict how the Pennsylvania Supreme Court
would resolve the issue.  If the Pennsylvania Supreme Court has not provided guidance, the court must
examine the decisional law of the Pennsylvania intermediate courts and decisions of federal courts and
other jurisdictions that discuss the issue.  See, e.g., Klein v. Weidner, 729 F.3d 280, 283 (3d Cir. 2013)
(citing cases).

[29]    While there may be a visceral discomfort in applying these principles to an intentional
fraudulent transfer that is reversed pre-petition, I see no principled reason to distinguish between actual
and constructive fraud.  Accord Gredd, 275 B.R. at 195 ("A transfer of property, **even if made with
fraudulent intent**, that does not leave any creditor in a worse position than he would have been had the
transfer never occurred, obviously does not offend the policy behind §548(a)(1)(A).") (emphasis added).
In that regard, I observe that many courts have recognized, albeit in a somewhat different context, that 11
U.S.C. §§548 and 550 are not designed to provide a general remedy rendering "civilly liable all persons
who may have contributed in some way to the dissipation of those assets."  Mack v. Newton, 737 F.2d
1343, 1358 (5th Cir. 1984) (citation omitted); Bank of America, N.A. v. F.D.I.C., 908 F. Supp. 2d 60, 89
(D.D.C. 2012); Baker O'Neal Holdings, Inc., v. Ernst & Young LLP, 2004 WL 771230, at *13 (S.D. Ind.
Mar. 24, 2004).

## B.  415 Worthington Mill Road

### 1.

The issues arising with respect to the property located at 415 Worthington Mill Road,

Richboro, PA ("the Worthington Mill Property") derive from four (4) deed transfers:

> (1)  In April 1996, Marina Ayzenberg ("Marina") purchased the Worthington Mill Property.  (Andrew Ex. 7, at 2).[30]
>
> (2)  On April 16, 2001, Marina transferred the Worthington Mill Property to herself and the Debtor.[31]
>
> (3)  On September 26, 2003, Marina and the Debtor transferred their interest in the property to Marina and Andrew for $1.00.  (Andrew Ex. 8; Trustee Response, Ex. M).
>
> (4)  On May 6, 2004, Marina and Andrew transferred their interest in the property back to Marina for no consideration, making her the sole record owner once again.  (Andrew Ex. 9; Trustee Ex. N).

In the Amended Complaint, the Trustee alleges that the third transfer (from Marina and

the Debtor to Andrew) was "for less than a reasonable equivalent value at a time when the

Debtor was insolvent."  (Amended Compl. ¶209).  The Trustee also alleges that after the

ostensible transfer to Andrew, the Debtor remained a "concealed owner."  (Id. ¶210).

The main thrust of Andrew's Motion is that the series of transactions resulted in a return

to the original status quo: Marina began as the owner and ended as the owner.

---

[30]      After purchasing the Worthington Mill Property, Marina built a home on the property. (Andrew Ex. 7, at 2).  As of July 2011, the Debtor and Marina were residing in the Worthington Mill Property.  (Non-Debtor Defendants' Answer to Amended Compl. ¶¶7-8; Debtor's Answer to Amended Compl. ¶¶7-8).

[31]      The April 16, 2001 deed is not in the summary judgment record.  However there is a reference to this transfer in the chain of title recital in two (2) subsequent deeds.  (See Andrew Motion, Exs. 8, 9).  There is no contrary evidence.

In her response, the Trustee focuses on the third transfer, arguing:

> Taken in context of the larger scheme taking place at the same time, the transfers of the Worthington Mill Street Property were clearly done with fraudulent intent to divest the Debtor of title. . . .
>
> Andrew ignores the fact that the "status quo" restored was not that from which Andrew received his fraudulent transfer (i.e., ownership titled in the names of the Debtor and Marina), but that from several years before. These transfers were merely one further step in the Debtor and Marina's overall plan to defraud their creditors, and contains all the hallmarks of a fraudulent conveyance – a transfer to an insider, for no consideration, and with no plausible explanation.

(Trustee Mem. at 61).[32]

## 2.

Andrew argues that he is entitled to judgment because the September 2003 transfer was not fraudulent under PUFTA, as a matter of law.  Andrew's argument turns on whether, at the time of the September 2003 transfer:

(1) the Debtor and Marina were married;

(2) they owned the Worthington Mill Property as tenants by the entireties; and

(3) the Debtor and Marina were jointly liable on any creditor claims.

If the Debtor and Marina were married, owned the property as tenants by the entireties and had no joint debts, then no fraudulent transfer under PUFTA occurred and Andrew is entitled to judgment on the Trustee's PUFTA claim because no "transfer" occurred, as that term is defined in PUFTA.

---

[32]      As with the Elbridge Property, the Debtor's transfer of the Worthington Mill Property occurred beyond the two (2) year lookback period of 11 U.S.C. §548(a).  Consequently, the Trustee's §548(a) claim is time barred.  However, the Trustee's PUFTA claim, based on the September 2003 transfer from the Debtor and Marina to Marina and Andrew is timely.  See Part VI., supra.

Case 10-00031-elf   Doc 604   Filed 02/27/14   Entered 02/27/14 12:06:19   Desc Main
Document   Page 48 of 75

To prevail on an avoidance claim under PUFTA, there must be a transfer within the meaning of the statute.  See 12 Pa. C.S. §§5104 and 5105 (both referring to a "transfer" being fraudulent).[33]  PUFTA defines transfer as "[e]very mode . . . of disposing of or parting with an asset or an interest in an asset."  12 Pa. C.S. §5101(b).  For there to be a transfer, there must be an "asset" that was transferred.  However, PUFTA excludes from the definition of the term "asset" any interest in property "held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant."  Id.

Under Pennsylvania law, a creditor of only one (1) spouse cannot reach property owned as tenants by the entireties; such property is not subject to process based on the claim of a creditor of only one spouse.  See, e.g., Napotnik v. Equibank and Parkvale Sav. Ass'n, 679 F.2d 316, 321 (3d Cir. 1982) ("a creditor of the debtor alone may not levy upon the debtor's individual undivided interest since his interest is immune from process"); see also In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007) Klebach v. Mellon Bank, N.A., 565 A.2d 448, 450 (Pa. Super. Ct. 1989).  Thus, entireties property is exempt from the creditors of just one spouse and cannot be the subject of a PUFTA avoidance action.  PUFTA is consistent with pre-PUFTA law on the subject.  See C.I.T. Corp. v. Flint, 5 A.2d 126, 128-29 (Pa. 1939).

On the other hand, if the Debtor and Marina were not married, they could not have owned the Worthington Mill Property as tenants by the entireties.  See, e.g., Masgai v. Masgai, 333 A.2d 861, 863 (Pa. 1975) ("it is not possible for two persons who are not married to one another to hold title to land as tenants by the entireties; marriage is an essential ingredient of such an

---

[33]   To be complete, the PUFTA also provides that an "obligation incurred" may be fraudulent, see 12 Pa.C.S. §§5104(a), 5105, but the present dispute involves only the transfer of an asset.

-48-

estate"). If they did not own the Worthington Mill Property as tenants by the entireties, then the

PUFTA exclusion of entireties property from the definition of "asset" would not apply and the

transfer of the Debtor's interest in the property to Andrew (and then back to Marina) may be

subject to avoidance.

**3.**

The Trustee disputes Andrew's contention that the Debtor and Marina were married at the

time of the transfer and has come forward with three (3) pieces of evidence to support her factual

contention regarding the Debtor's marital status:

> (1)   the Debtor's 2004 federal income tax return in which he stated his filing
>        status as "single," (Trustee Ex. J);
>
> (2)   Marina's 2004 federal income tax return in which she stated that her filing
>        status was "head of household," (Trustee Ex. K);[34] and
>
> (3)   the deposition testimony of Adam Simmens, the accountant who prepared
>        the tax returns for the Debtor and Marina, in which he stated that, in 2007,
>        the Debtor told him that he was single and Marina told him that she was not
>        married, (Trustee Ex. L, at 29-30).

Obviously, Simmens deposition testimony is not pinpointed to the critical time period of

September 2003, when the subject transfer was made. Nevertheless, bearing in mind that all

reasonable inferences are to be made in favor of the party opposing summary judgment, the

Trustee has done just enough to raise a disputed issue of material fact regarding the Debtor's

---

[34]     One has to be unmarried at the end of the taxable year to file as "head of household." 26
U.S.C. §2(b)(1).

marital status.  This requires denial of Andrew's Motion with respect to the transfer of the

Worthington Mill Property.[35]

## C. Fox Lake Realty

Fox Lake Realty LP ("FLR") was formed in or around 2004 for the purpose of acquiring

and developing real estate.  There is no dispute that Lena, Marina and Andrew were original

---

[35]      Even if Andrew proves at trial that the Debtor and Marina were married at the time of the
transfer of entireties property, the Trustee may still have a viable claim if the Debtor and Marina had any
joint creditors at the time of the transfer sought to be avoided.  As discussed in connection with Larisa's
Motion in Part IX.B.1., infra, Marina testified at her deposition that some of her actions were motivated
by a desire to obtain some protection from the Debtor's creditors.  She stated that she was concerned
about her potential liability to the Debtor's automobile creditors, although she did not explain the nature
of that potential liability.  (Trustee Ex. Y at 21-22).  This testimony suggests the possibility that the
Debtor and Marina had joint creditors.  If so, any transfers of entireties property would be "transfers"
under PUFTA, potentially subject to avoidance.  However, all that one can glean from her deposition
testimony is that Marina signed some document relating to the "warehouse line of credit" obtained by the
Debtor in connection with at least one (1) of the dealerships.  There is no further information regarding
the nature of the document that Marina signed.  Without knowing more, it is impossible to determine if
she was jointly liable on the debts in a manner sufficient to strip the property she and the Debtor may
have owned as tenants by the entireties of the protections Pennsylvania law affords against the creditors
of just one spouse.  See generally In re Holler, 463 B.R. 733, 747-48 (Bankr. E.D. Pa. 2011) (separate
judgments entered against spouses on separate loan guaranties of the same loan are not joint claims that
override the property exemption for entireties in Pennsylvania).

         Finally, I note that in the event that Andrew makes out the "entireties property" defense
to this PUFTA claim, the Trustee may have yet another fallback argument.  In responding to the Motion
to Dismiss the Complaint, the Trustee suggested that the Debtor's and Marina's ownership of the
Worthington Mill Property as tenants by the entireties was itself the product of a fraudulent transfer.  The
Trustee alleged that when Marina originally purchased the property in her own name in April 1996, she
did so with money that belonged solely to the Debtor.  Thus, as the Trustee sees it, the April 2001
transfer from (a) Marina to (b) Marina and the Debtor as tenants by the entireties, should be
conceptualized as a transfer from the Debtor to the Debtor and Marina.  For pleading purposes, these
allegations were sufficient to prevent dismissal of the claim.  We are now at summary judgment.  While I
do not need to reach this second fallback argument because Andrew's motion is being denied on other
grounds, I note two (2) possible problems with it.  First, the Trustee came forward with no evidence to
support her contention the Debtor was the source of the money for the original purchase of the
Worthington Mill Property and that titling the property in Marina's name was itself fraudulent.  Second,
the original purchase appears to have occurred beyond the 10 year lookback period.  Thus, if the facts
ultimately are determined to be that the Worthington Mill Property was entireties property and there were
no joint debts in September 2003, the Trustee may not be able to sustain this claim.

principals of FLR.  The parties disagree whether the Debtor had an ownership interest in the

entity.  The Trustee asserts that the Debtor held a valuable ownership interest in FLR that he

fraudulently transferred to the other owners.

The merits of Andrew's Motion with respect to FLR is intertwined with Lena's Motion

on the same subject.  I will defer my discussion of Andrew's Motion and the reasons for its

denial, to Part VIII.A.1-4., infra.


## VIII.  LENA'S MOTION

Lena asserts that she is entitled to summary judgment on the Trustee's fraudulent transfer

claims under 11 U.S.C. §548 and PUFTA with respect to two (2) categories of asset transfers.

The two (2) categories encompass nine (9) distinct alleged asset transfers.

Based on the summary judgment record,  I conclude that Lena is entitled to summary

judgment with respect to six (6) transfers the Trustee alleges are avoidable and that her Motion

should be denied with respect to the other three (3) transfers.


### A.  Transfer of the Debtor's Alleged Interest in Fox Lake Realty LP

#### 1.

As stated above, the threshold factual issue regarding the Trustee's claim regarding the

Debtor's  alleged fraudulent transfer of his interest in FLR is whether the Debtor even had an

ownership interest in the entity.

The Trustee maintains that the Debtor, Marina, Lena and Andrew were all equal (25%)

principals in FLR.  She bases this contention on three (3) sources in the record.  First, the Non-

Debtor Defendants admitted as much in their Answers to the Amended Complaint. (Non-Debtor Defendants' Answer to Amended Compl. ¶20). Second, in her initial deposition, Lena testified that the Debtor had an ownership interest in FLR. (Trustee Ex. RR, Lena Deposition at 68-69). Third, FLR's federal tax return for 2005, (filed by Lena), stated that the Debtor, Marina, Lena and Andrew each owned a 25% limited partnership interests in FLR and that the Debtor's capital account totaled $184,012.00. (Trustee Ex. OO).

The Trustee's avoidance claim derives from the fact that, roughly one (1) year after filing the 2005 federal income tax return, FLR issued K-1's to Lena and Andrew stating that they each owned a 50% interest in the entity. (Trustee Ex. PP). The Trustee infers that a transfer of the Debtor's 25% interest occurred in the interim. The Trustee claims that the transfer was fraudulent because there is no evidence that the Debtor received any consideration for the transfer of his interest in FLR.

Lena disputes that the Debtor ever owned an interest in FLR. At a second deposition,[36] she recanted both her admission in the pleadings and her earlier deposition testimony. (Trustee Ex. QQ, Lena Deposition at 36-38). She stated that the written record of Debtor's inclusion as a partner in FLR was some type of error and that his record ownership was terminated for that reason. (Id.). During the later deposition, Lena also explained that the 2006 K-1's reflected that Marina no longer had an interest in FLR because Marina relinquished her interest in return for a payment of $200,000.00. (Lena Ex. 13, Lena Deposition at 57-58).

---

[36]   The original deposition was held on January 11, 2013. The later deposition was held on June 18, 2013.

-52-

Lena contends that this record establishes that the Debtor had no interest in FLR and thus, no property interest was transferred that might be subject to avoidance. Further, she argues that even if the Debtor had an interest in FLR, Trustee has failed to present evidence regarding valuation of the transferred property and therefore, lacks proof of a necessary element of her avoidance claim. As explained below, I respectfully disagree with both of these arguments.

## 2.

Lena's argument that she is entitled to summary judgment on the ground that the Debtor had no interest in FLR fails because there is a material fact in dispute.

Initially, unless and until Lena obtains leave to amend her Answer to the Amended Complaint, she is bound by her judicial admission in her pleading that the Debtor held an interest in FLR. See, e.g., In re C.F. Foods, L.P., 265 B.R. 71, 87 (Bankr. E.D. Pa. 2001).[37]

Even if Lena were relieved from her judicial admission, her deposition testimony, as well as the statements in the tax returns filed with IRS, both constitute evidence that the Debtor had an interest in FLR. This evidence is admissible under Fed. R. Evid. 801(d)(2)(A). See Eugene G.

---

[37]     Generally, factual assertions admitted by a party in an answer or response are considered judicial admissions which are conclusively binding upon the party who made them. Once a pleading is superceded by an amended answer or response, however, the admissions in the superceded pleading, as a general rule, lose their binding force. A party may introduce superceded admissions into evidence to be considered as adverse evidentiary admissions by the fact-finder.

C.F. Foods, 265 B.R. at 87 (citations omitted); accord Sunlight Elec. Contracting Co., Inc. v. Turchi, 918 F. Supp. 2d 392, 396 n.3 (E.D. Pa. 2013).

Ziobron, Inc. v. U.S., 172 F.3d 53, 1998 WL 879526, at *1 (7th Cir. 1998) (nonprecedential);

Dixon v. CertainTeed Corp., 915 F. Supp. 1158, 1161 (D. Kan. 1996).[38]

Thus, separate and apart from the judicial admission, the Trustee has presented sufficient

evidence in the record to create a disputed issue of material fact.  In effect, Lena asks me to credit

one portion of her deposition testimony over the earlier portion that it contradicted.  In light of

her inconsistent statements under oath, factfinding is required and it is axiomatic that courts do

not weigh conflicting evidence and engage in factfinding at summary judgment stage of a case.

---

[38]    Lena asserts that statements made in tax returns are insufficient, as a matter of law, for
the Trustee to sustain her burden of proof.  Lena relies primarily on four (4) Tax Court decisions: Cordes
v. Comm. of Internal Revenue, T.C. Memo 1994-377, 1994 WL 418899 (T.C. 1994); Wilkinson v.
Comm. of Internal Revenue, 71 T.C. 633 (T.C. 1979); Roberts v. Comm. of Internal Revenue, 62 T.C.
834 (T.C. 1974); Roberts v. Comm. of Internal Revenue, 8 T.C.M. (CCH) 60, 1949 WL 7706 (T.C.
1949).

        Lena overstates the holding of these decisions.  In all four (4) decisions, the taxpayer
sought to use a prior tax return as evidence of the truth of the information in the return and the courts,
quite properly, rejected that contention because tax returns "do not establish the truth of the facts stated
therein."  Cordes, 1994 WL 418899 at *7.  Tax returns are "merely a statement of the petitioner's claim .
. .  [and are] not presumed to be correct."  Roberts, 62 T.C. at 837.

        That tax returns constitute only a prior statement of the taxpayer is exactly the point.  In
effect, the Tax Court repeatedly has rejected the bootstrap argument that the prior tax return, filed under
oath, is evidence that the return was accurate.  In this adversary proceeding, however, the Trustee is using
the tax return for a different purpose.  The Trustee is using the statements in the tax return against Lena
as an evidentiary admission.  That distinguishes the Tax Court cases Lena cites.

        Nor does the one (1) bankruptcy court decision Lena cites, In re Dishaw, 78 B.R. 120,
125 (Bankr. E.D. Va. 1987), support her position.  In Dishaw, the bankruptcy court merely held that the
debtor's tax return was not probative on the issue whether the debtor knowingly gave the plaintiff false
financial statements because the return was prepared after the financial statements.  Nothing in Dishaw
suggests that tax returns lack probative value as admissions merely due to their status as tax returns.

**3.**

Next, Lena argues that the Trustee has presented no valuation evidence that would permit a finding that the Debtor's transfer of his interest in FLR was for less than reasonably equivalent value.[39]  According to Lena, two (2) consequences flow from this asserted evidentiary gap: (1) no inference of actual fraudulent intent might be drawn pursuant to 12 Pa. C.S. §5104(b)(8), and (2) an essential element of the Trustee's constructive fraud claim under 12 Pa. C.S. §5104(a)(2) is lacking.

As the Trustee points out in her response, the summary judgment record includes at least two (2) pieces of evidence on valuation that support her contentions: (1) the reference to value on the 2005 K-1 (i.e., $184,012.00 in the Debtor's capital account) and (2) Lena's payment of $200,000.00 to purchase Marina's 25% interest  – the same percentage interest arguably held by the Debtor.  This evidence precludes summary judgment in Lena's favor.

---

[39]     Lena elaborates this argument as follows:

> FLR is a Pennsylvania limited partnership. In late 2005, it held some real estate assets but the assets were largely encumbered by mortgages. Furthermore, Lena, more than anyone else, capitalized the company with her own personal funds. See [Ex] Lena-13 at 20:18-23:13. Assuming Debtor had a 25% limited partnership interest, its valuation is a critical element of a  fraudulent transfer claim. It may very well be that Debtor's interest had zero value considering the mortgages and other liabilities of FLR at the time and considering the discounts for lack of marketability and lack of control ascribed to limited partnership interests by valuation jurisprudence.

(Lena Mem. at 15) (footnote omitted).

-55-

**4.**

As for Andrew's Motion, Andrew bases his request for summary judgment on the ground that the Amended Complaint states that in late 2005, the Debtor conveyed his 25% interest in FLR to Lena for no consideration and does not mention a transfer to Andrew.  (Amended Compl. ¶71).  However, as stated above, the juxtaposition of the 2005 and 2006 FLR K-1 statements provides some evidence of Andrew's and the Debtor's individual ownership interest in FLR and the transfer of the Debtor's interest.  There is a reasonable inference that can be drawn that Andrew was at least a partial recipient of the asserted transfer.

As I concluded in connection with Lena's Motion, there is a disputed issue of material fact; specifically, whether the Debtor had an interest in FLR that was transferred in 2006 for less than reasonably equivalent value to Andrew, at least in part.  Therefore, the Andrew Motion will be denied with respect to the alleged FLR transfer.

**B.  The Bank of America Account Transfers**

**1.**

In the Amended Complaint, the Trustee alleges that the Debtor and Marina maintained a checking account with Bank of America (ending in digits – 0242) ("the BOA Account") between 2005 and 2007 "into which hundreds of thousands of dollars in cash were both deposited and withdrawn."  (Amended Compl. ¶88).  The Trustee further alleges that the Debtor was the source of the deposits into the account.  (Id. ¶89).  The Amended Complaint then identifies twenty-two (22) transfers from the BOA Account that occurred between March 19, 2005 and April 30, 2007. (Id. ¶90).  Five (5) of those transfers, totaling $214,744.20 were to Lena.  The five transfers were:

    (1)    A check dated June 21, 2005 in the amount of $44,572.70 made payable to Wachovia Bank and earmarked for Lena ("BOA Check #1");

    (2)    A cashiers' check dated September 19, 2005 in the amount of $78,125.00 made payable to Lena ("BOA Check #2");

    (3)    A check dated October 6, 2005 in the amount of $22,480.50 made payable to Wachovia Bank and earmarked for Lena ("BOA Check #3");

    (4)    A check dated November 30, 2005 in the amount of $34,783.00 made payable to Lena and marked "loan repayment" ("BOA Check #4"); and

    (5)    A check dated December 10, 2005 in the amount of $34,783.00 made payable to Lena and marked "loan payoff" ("BOA Check #5").

Lena asserts that she is entitled to summary judgment with respect to all five (5) transfers. As explained below, she is entitled to summary judgment with respect to two (2) of the five (5) transfers.

**2.**

With regard to all five (5) transfers, Lena argues that her receipt of the BOA checks are not avoidable under PUFTA because the Debtor and Marina held the BOA Account as tenants by the entireties. (Lena Motion at 21-22). As discussed in Part VII.B.2, supra, entireties property is excluded as an "asset" under PUFTA. In connection with Andrew's Motion, I concluded that the Trustee raised an issue of material fact regarding the Debtor's and Marina's marital status. See Part VII.B.3, supra. This precludes summary judgment on the ground Lena suggests.

-57-

**3.**

Lena asserts that BOA Check # 1 is derived from the net proceeds from a sale of real property that Lena and the Debtor owned jointly, 207 Elbridge Street, Philadelphia, PA ("the Elbridge Property"). (See Lena Affid. ¶2). The Debtor and Lena sold the Elbridge Street Property to an individual named Elena Kholbystova on June 17, 2005 for $142,000.00. (Lena Affid. ¶2; Andrew Ex. 6). Lena produced a "settlement statement" that shows that she and the Debtor were to receive $91,148.76 less settlement costs from the sale of the Elbridge Property. (Lena Ex. 26). Lena states that the sale proceeds were deposited into the BOA Account and that BOA Check # 1 represents 50% of the net proceeds from the sale. (Lena Affid. ¶2). In support of this contention, she produced a BOA Account bank statement for June 2005, which shows a deposit of $89,145.43 on June 20, 2005 and the subsequent transfer of $44,572.70 from the account as a result of the issuance of BOA Check # 1. (Lena Ex. 14). Based on this evidence, Lena claims that there are no disputed issues of fact because the Trustee has no evidence that the transfer lacked adequate consideration or was intended to hinder, delay or defraud creditors.

The Trustee has not come forward with any affirmative evidence that the transfer evidenced by BOA Check # 1 was fraudulent. Instead, the Trustee points to Lena's answers to interrogatories in which she gave a different explanation for her receipt of BOA Check # 1: that it was in repayment of a loan. (Trustee Mem. at 47-48).[40] The Trustee contends that the

---

[40] The Trustee did not submit the interrogatory answers referenced in her memoranda, leaving the Trustee's argument without support in the record. However, in her response, Lena did not dispute the inconsistency between her interrogatory answers and her summary judgment affidavit. Therefore, I will accept the Trustee's representations regarding the content of Lena's prior statements.

inconsistent explanations, by themselves, are evidence that the checks were issued with

fraudulent intent.  (Trustee Supp. Mem. at 16-17).

Certainly, there are reported decisions stating that implausible or inconsistent

explanations of behavior are a "badge of fraud."  See, e.g., Daoud v. Comm. of Internal Revenue,

2013 WL 6405826, at *1 (9th Cir. Dec. 9, 2013) (nonprecedential); Pesky v. U.S., 2013 WL

3457691, at *11 (D. Idaho July 8, 2013); Greene v. U.S., 207 B.R. 21, 25 (Bankr. M.D. Fla.

1997).  In the circumstances presented here, however, and even accepting arguendo, the principle

that a prior inconsistent statement may be some evidence of fraudulent intent in connection with

a transfer of property,[41] Lena's prior inconsistent explanation for the transfer memorialized by

BOA Check # 1, by itself, does not create an issue of material fact sufficient to withstand

summary judgment.

The explanation Lena provided in her summary judgment affidavit was accompanied by

documentary evidence that was consistent with the explanation that BOA Check # 1 represented

her share of the net proceeds from the sale of the Elbridge Property.  The Trustee has not made

any showing that the documentary evidence is itself suspect.  The Trustee's response is limited to

the fact that Lena previously referenced a different transaction as the explanation for the issuance

of BOA Check # 1.

---

[41]     There are many reported decisions referring to "inconsistent explanations" as a badge of
fraud.  Almost every one of them involves tax fraud or tax evasion.  Interestingly, the "black letter" law
grouping of "badges of fraud" for fraudulent transfers does not include "inconsistent explanations" as a
badge of fraud.  See, e.g., 12 Pa.C.S. §5104(b); In re Crater, 286 B.R. 756, 760 n.5 (Bankr. D. Ariz.
2002) (listing eleven (11) badges of fraud under the Uniform Fraudulent Transfer Act).  Thus, it is not
clear whether a prior inconsistent statement constitutes independent, affirmative evidence of a fraudulent
transfer or is something less, "only" evidence that impeaches the credibility of defendant who provides
an "innocent" explanation for the transfer.  It is not necessary to decide this "hair-splitting" issue to
resolve the pending motion.

Taking into account the documentary evidence Lena has submitted, the Trustee's response is inadequate.  Although the court is obliged to view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, "to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]."  S.H. ex. rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 256 (3d Cir. 2013) (citations and quotations omitted).  The Trustee has not presented evidence that would support a finding by a jury that the transfer was fraudulent.  The Trustee's case consists of the transfer and an inconsistent explanation of the reason for the transfer.

In my judgment, given the documentary support of Lena's second explanation, the prior inconsistent statement, by itself, is insufficient to prove the Debtor's fraudulent intent or the absence of reasonable consideration for the transfer.  In other words, if the record at trial consisted of what has been presented on summary judgment, Lena would be entitled to a directed verdict because "considering the weight of the evidence, there can be but one conclusion as to the verdict" that can be reached by a reasonable factfinder.  9B C. Wright & A. Miller, Federal Practice & Procedure §2524 (3d ed. 2013) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)); see also Schoonejongen v. Curtis-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) (referring to non-movant's obligation to submit a "sufficient quantum" of evidence to create an issue on which "reasonable minds [may] differ").  Consequently, Lena is entitled to summary judgment with respect to the transfer memorialized by BOA Check # 1.

**4.**

Lena asserts that BOA Check # 2 is derived from the net proceeds from the sale of 2709 Woodsview Drive, Bensalem, PA ("the Woodsview Drive Property"), real property jointly owned by her husband, Andrew, and her (alleged) sister-in-law, Marina.  (See Lena Affid. ¶3; Lena Ex. 19).  Lena contends that on August 31, 2005, Andrew and Marina sold the property, netting $160,624.40.  (Id.).  That sum that was deposited in the BOA Account on September 1, 2005.  (Ex. B to Lena Affid.).  Lena argues that the cashier's check, dated September 9, 2005, which the Debtor remitted to her represents "approximately 50% of the deposited amount" and represented "our share" of the net proceeds, ("our" referring to Lena and Andrew).  (Lena Affid. ¶3).

In response, the Trustee points to Lena's answers to interrogatories in which she gave a different explanation for her receipt of BOA Check # 2.  In her interrogatory answers, she stated that BOA Check # 2 was related to the sale of the Elbridge Property, not the Woodsview Drive Property.  (Trustee Mem. at 47-48).

The circumstances and legal issues with respect to BOA Check # 2 are similar to those discussed above regarding BOA Check # 1.  However, there are two (2) differences.

First, other than submitting the deed evidencing the sale of the Woodsview Drive Property, Lena has not come forward with any of the real estate transaction documents verifying the link between the net proceeds and the deposit of $160,624.40 into the BOA Account.  Thus, there is less certainty that the deposit of $160,624.40 is the fruit of the Woodsview Drive Property sale transaction.

Second, Lena had no obvious entitlement to her husband Andrew's one-half share of the net proceeds of the sale. Combined with the absence of corroboration of the source of the deposit, the issuance of the check to Lena, rather than Andrew, is enough of an "irregularity" to convince me that a reasonable factfinder might disbelieve Lena's explanation, leaving as the only facts, the deposit into the BOA Account and the transfer, through BOA Check # 2, for no apparent consideration.

This record is sufficient to raise a disputed issue of material fact regarding the consideration and purpose of BOA Check # 2 and to preclude the entry of summary judgment in Lena's favor.

## 5.

Turning next to BOA Check #'s 3, 4 and 5, Lena offers a simple explanation for her receipt of these transfers. She avers that they represent the repayment of a $160,000.00 loan she made to the Debtor in late 2003 or 2004 to help him pay his personal income tax liability for tax year 2001. (Lena Affid. ¶4). In order to advance the loan to the Debtor, she drew down on a Wachovia Bank line of credit that she had at the time; which would explain why one (1) of the three (3) BOA checks was payable to Wachovia Bank. (Id.). She has no further documentary evidence regarding the Wachovia line of credit because she "did not retain statements from 2003 or 2004 and, due to the passage of time, these statements are no longer available from Wachovia's successor, Wells Fargo." (Id.).

The Trustee again responds by relying on what she considers to be a prior inconsistent statement. However, the only difference between Lena's interrogatory answer and her summary

judgment affidavit appears to be the amount that she drew down on the Wachovia line of credit (i.e., $140,000.00 vs. $160,000.00).  (See Trustee Mem. at 48).

I do not consider the difference between Lena's interrogatory answer and her summary judgment affidavit to be a material inconsistency.  Therefore, the only evidence in the summary judgment record is Lena's plausible explanation that BOA Check #'s 3, 4 and 5 were issued in repayment of a loan, supported by at least some documentary evidence.  The Trustee has presented no contradictory evidence.  Lena is entitled to summary judgment because the Trustee has not come forward with any evidence that the transfers represented by BOA Check #'s 3, 4 and 5 were fraudulent.  See Part V.B, supra.

## C.  The Motostrada Claim

The Trustee seeks to recover certain transfers that Defendant Motostrada made to members of the Debtor's family or other businesses in which the Debtor had an interest on the theory that the payments actually were LLC distributions to the Debtor disguised as transfers to third parties.  (See Amended Compl. ¶149(j)).  One such alleged disguised distribution was a $5,000.00 check, dated September 7, 2007, that Motostrada made to Lena.  The Trustee claims that the transfer was both intentionally and constructively fraudulent under 11 U.S.C. §548 and PUFTA.  (See id. ¶¶149(j), 284(b), 296, 307, 319).[42]

---

[42]     In Count II of the Amended Complaint, the Trustee also asserted that the $5,000.00 transfer to Lena was an avoidable preference under 11 U.S.C. §547(b).  (Amended Compl. ¶284(b)).  Lena has requested summary judgment on the preference claim and the Trustee has opposed that request.  Both parties apparently forgot that the Count II preference claim against Lena was dismissed by paragraph 2.b.(2) of the court's order dated July 1, 2011.  (See Doc. # 137).  No further discussion of the issue is necessary.

Lena requests summary judgment on this claim, asserting that the $5,000.00 check was issued to repay Dynamic Funding, Inc. and Dynamic Funding Solutions, Inc. (companies owned by Lena) for payments those companies made to a third party that had provided vehicle transport services to Motostrada.  (Lena Affid. ¶5).  She claims that "[f]or the sake of convenience and expedience, the check was written to me personally."  (Id.).

Lena's request for summary judgment on this claim will be denied.  In her Motion, she acknowledges that Steven Kravetz, a co-owner of Motostrada, has averred that the check was recorded as "Len or Marina taking out the money and making it payable to Lena."  (Lena Motion ¶110).  Moreover, the failure to respect corporate formalities (i.e., the payment being made to Lena personally and not to the alleged creditor, Dynamic Funding) is significant.  Together, this evidence is sufficient to raise a disputed issue of material fact and requires denial of Lena's Motion with respect to this claim.

## D.  The New Century Claim

In the Amended Complaint, the Trustee alleged that New Century LLC ("New Century") is a chiropractic clinic, which the Debtor and Lena "started," and that "75% of its profit went" to Lena and the Debtor.  (Amended Compl. ¶¶172, 174).  Dr. Caroline Barry operates the clinic. The Amended Complaint raised fraudulent transfer claims against various Defendants, including Lena, based upon the Debtor's alleged ownership interest in New Century.  (Id., Counts III, IV, V and VI).[43]

---

[43]      The Amended Complaint lacks detail regarding the factual circumstances of these transfers.  In denying the Motion to Dismiss this claim, I read the Amended Complaint very liberally in

(continued...)

Lena seeks summary judgment on the ground that the summary judgment record lacks

evidence that any interest the Debtor may have had in New Century was ever transferred to any

third party (much less any evidence of the value of any interest so transferred).[44]  I agree.

The thrust of the Trustee's claim is that the Debtor owned an interest in New Century and

some property interest related to that ownership interest (presumably, dividend rights) was

fraudulently transferred to third parties, including Lena.  We are now at summary judgment and

as explained in Part V.B., <u>supra</u>, it was incumbent on the Trustee to develop a factual record

regarding the transfers that she seeks to avoid.  As stated earlier, it is an elementary principle

under Rule 56 that in responding to summary judgment, a party cannot rely on the pleadings, but

must designate specific factual averments through the use of affidavits or other permissible

evidentiary material which demonstrate a genuine issue of material fact to be resolved at trial.

Celotex Corp., 477 U.S. at 324; Anderson, 477 U.S. at 247–50.

---

[43](...continued)
the Trustee's favor.

[44]       Lena also asserts that the Trustee has no competent evidence to prove that the Debtor
ever had an ownership interest in New Century, which is the factual predicate to the Trustee's fraudulent
transfer claim.  Lena claims that the only evidence the Trustee has regarding the Debtor's alleged interest
in New Century is Dr. Barry's deposition testimony given in divorce proceedings between Larisa and her
husband.  Further, Dr. Barry has since recanted her prior testimony that the Debtor owned an interest in
New Century.  Dr. Barry now claims that it was Lena and Lena's husband Andrew, not the Debtor, that
owned an interest in the entity.  Lena argues that Dr. Barry's initial deposition testimony is inadmissible
hearsay, see Fed. R. Evid. 802 and 804(b), and cannot be considered on summary judgment, see Fed. R.
Civ. P. 56 (d).  As a result, according to Lena, the Trustee now lacks admissible evidence to prove an
essential element of her case.  The Trustee responds by pointing out that she may call Dr. Barry to testify
at trial and that her prior testimony in the divorce case can be used to impeach her credibility (assuming,
of course, that she testifies in a manner consistent with her later sworn statement).

Query whether use of the prior testimony to impeach Dr. Barry would be sufficient to
support a finding that the Debtor owned an interest in New Century?  Because I decide Lena's Motion on
other grounds, I do not decide the issue.

In her response to Lena's Motion, the Trustee has not come forward with any evidence of any transfers of the Debtor's purported interest or entitlement to distributions from New Century. As a result, Lena is entitled to summary judgment on this claim.

### E.  207 Elbridge Street

Lena moves for summary judgment on the transfer of the Elbridge Property as a fraudulent transfer under 11 U.S.C. §548 and PUFTA.  The factual circumstances of the Elbridge Property transfer were explained in Part VII.A., supra.  For the reasons stated above in connection with Andrew's Motion, the transfer of the Elbridge Property back to the Debtor pre-petition is a complete defense to the Trustee's fraudulent transfer claims.  Lena is therefore, entitled to summary judgment with respect to this transfer.

### IX.  LARISA'S MOTION

The Trustee alleges that the Debtor transferred assets from a joint account at Charles Schwab ("the 7348 Schwab Account"), to various family members, including Larisa, as part of his fraudulent transfer scheme. and that two (2) transfers to Larisa in September 2003[45] are avoidable pursuant to 11 U.S.C. §548 and PUFTA.[46]

---

[45]      Both alleged transfers occurred before the two (2) year lookback period of 11 U.S.C. §548(a); therefore, the Trustee's §548(a) claim is time barred.  However, the Trustee's PUFTA claim, based on the September 2003 transfers from the Debtor and Marina to Larisa is still potentially viable under the extended lookback period provided to the Trustee if she establishes the creditor status of the IRS.  See Part VI., supra.

[46]      In her Motion, Larisa winnowed out several factual allegations from the Amended

(continued...)

In her motion, Larisa argues she is entitled to judgment as a matter of law as to both

transfers.  Her Motion will be granted in part and denied in part.


### A.  The 7348 Schwab Account

### 1.

The Debtor and Marina opened the 7348 Schwab Account in 1994.  (See Larisa Ex. 1).

Between September 18, 2003 and September 22, 2003, the Debtor and Marina transferred

$1.23 million from the 7348 Schwab Account to another Charles Schwab account ("the 7367

Schwab Account") owned by Marina's father, Joseph Ayzenberg.[47]  (See Trustee Ex. Q).  On

September 24, 2003, Ayzenberg transferred $510,000.00 back to the 7348 Schwab Account.

(See id.).

On September 23, 2003, the Debtor and Marina added Larisa to the 7348 Schwab

Account as a joint account holder.  (See Trustee Ex. P).  The 7348 Schwab Account statements

---

[46](...continued)
Complaint regarding Larisa's role in acting as a notary public for certain documents related to
transactions involving the Debtor or his interests ("the Notary Claims").  Larisa seeks summary judgment
as to those allegations.  The Trustee has not asserted any claim in this adversary proceeding against
Larisa based on her actions as a notary public.  Accordingly, there is no reason for the court to act on this
aspect of the Larisa Motion.

[47]      There were three (3) separate transfers from the Debtor's 7348 Schwab Account to
Joseph's 7367 Schwab Account:

|  |  |
|---|---|
| 9/18/2003 | $150,000.00 |
| 9/22/2003 | $380,000.00 |
| 9/22/2003 | $700,000.00 |

(Trustee Ex. Q).

indicate that the account was held as "Joint Tenants with Right of Survivorship."  (Id.).  Larisa

avers that she did not contribute anything to the 7348 Schwab Account.  (Larisa Affidavit ¶5).

At her deposition, Marina testified that she added Larisa to the 7348 Schwab Account to prevent

the Debtor from being able to continue contributing money into the Automobile Dealerships, but

she did not explain how adding Larisa to the account would serve to restrict the Debtor's access

to it.  (See Larisa Ex. 2, Marina Dep. at 123-25).


## 2.

The Trustee argues that the addition of Larisa to the 7348 Schwab Account effected a

transfer of the Debtor's interest for no consideration and thus, for less than reasonably equivalent

value.  The Trustee contends that adding Larisa as a joint account holder gave her a one-third

interest in the 7348 Schwab Account thereby diluting the Debtor's interest from one-half to one-

third.  The Trustee further contends that the addition of Larisa transformed the account from one

held as tenants by the entireties to one held as either joint tenants or tenants in common.

Larisa contends that no avoidable transfer occurred because the Debtor and Marina

owned the 7348 Schwab Account as tenants by the entireties at the time they added her name to

the account and therefore, no "transfer," as contemplated by PUFTA occurred.  See Part VII.B.2,

supra.  However, as stated in Part VII.B.3, the Debtor's and Marina's marital status, and

therefore, their capacity to own property as tenants by the entireties, is a disputed issue of

material fact.

Larisa raises a second argument.  Even assuming that the Debtor and Marina were not

married, Larisa argues that no transfer occurred when she was added to the 7348 Schwab

-68-

Account by virtue of the Pennsylvania Multiple Party Accounts Act, 20 Pa.C.S. §6301, et seq.,

("the MPAA"). The MPAA instructs that there is a legal presumption that an account is owned

by the parties in proportion to their respective net contributions, absent evidence of a contrary

intent. 20 Pa. C.S. §6303(a). The party claiming that a contrary intent exists, (i.e., the owners of

the account intended to gift an interest in the asset to a person who made a lesser or no net

contribution), bears the burden of proving that intent by "clear, precise, direct and convincing

evidence." In re Estate of Cambest, 756 A.2d 45, 53 (Pa. Super. Ct. 2000) (quoting Wilhelm v.

Wilhelm, 657 A.2d 34, 37 (Pa. Super. Ct. 1995)).


### 3.

In requesting that summary judgment, Larisa relies on the MPAA's presumption that the

addition of a joint account holder on a bank account does not evidence a present intent by the

account owner to create a joint tenancy and will not be considered an irrevocable inter vivos

transfer. Stated in converse terms, under the MPAA, a rebuttable presumption arises when the

holder of a joint account makes a contribution to the joint account, the contribution is **not**

deemed to be an irrevocable gift of one-half of the contribution to the other party. 20 Pa.C.S.

§6303(a); In re Novosielski, 992 A.2d 89, 105-06 (Pa. 2010); Deutsch, Larrimore & Farnish,

P.C. v. Johnson,848 A.2d 137, 143 (Pa. 2004); Boyle v. King, 2010 Pa. Dist. & Cnty. Dec.

LEXIS 313, at *16 (C.P. Allegheny Sept. 24, 2010).

Larisa claims that she did not make any contributions to or receive any interest in the

7348 Schwab Account. See 20 Pa.C.S. §6303(a) ("A joint account belongs, during the lifetime

of all parties, to the parties in proportion to the net contributions by each to the sum on deposit,

unless there is clear and convincing evidence of a different intent.").

The only evidence in the record is Larisa's statement that she made no net contributions

to the 7348 Schwab Account.  Accepting the veracity of her unchallenged statement and absent

some contrary evidence regarding Debtor's and Marina's intent to gift her an interest in the

account, the addition of Larisa's name to the 7348 Schwab Account did not transfer any

beneficial interest in the account to her.  The Trustee has developed no evidence to override the

MPAA presumption, by showing either that Larisa made a net contribution to the account or that

the Debtor and Marina intended to gift an interest in the account to Larisa.   Based on the MPAA,

the mere addition of Larisa's name to the account is insufficient, as a matter of law, to prove that

she obtained property rights in the account.

In the absence of at least some evidence of an intent to gift an interest in the 7348 Schwab

Account, the Trustee has not met her burden of producing evidence giving rise to a material issue

of fact sufficient to override the MPAA presumption.  Based on this record, Larisa is entitled to

summary judgment on this claim.

### B.  The 0707 Delaware Account

### 1.

As stated above, between September 18, 2003 and September 22, 2003, the Debtor and

Marina transferred $1.23 million from the 7348 Schwab Account to Joseph Ayzenberg's 7367

Schwab Account.  On September 23, 2003, Joseph wrote a $610,000.00 check to Larisa.  (Larisa

Ex. 4).  At his deposition, Joseph could not recall why he wrote this check.  (See Trustee Ex. AA at 57-58).

On September 24, 2003, Marina and Larisa opened a bank account at First Bank of Delaware ("the 0707 Delaware Account") and deposited Joseph's $610,000.00 check.  (Larisa Ex. 5).  The account was opened in both of their names as a joint account "with survivorship." (Larisa Ex. 5).

At her deposition, Marina testified that she opened the account with Larisa because she believed that the joint account would give her some financial protection.  She stated that she was concerned about her potential liability to the Debtor's automobile creditors, although she did not explain the nature of that potential liability.

On October 12, 2003, Marina wrote a check for $608,450.00 from the 0707 Delaware Account to Fox Lake Management, LLC.  (Larisa Ex. 6).  Marina could not recall why she wrote the check to Fox Lake Management.  (Trustee Ex. CC at 170).

After the October 12, 2003 check, the 0707 Delaware Account was inactive until Marina withdrew the remaining $1,630.42 and closed the account in July 2007.  (Larisa Ex. 8).

## 2.

The Trustee seeks to "follow the money" from the Debtor's 7348 Schwab Account beginning with the transfer of approximately $1.23 million from the 7348 Schwab Account to Joseph's 7367 Schwab Account and continuing with Joseph's check to Larisa and the deposit of that check in the 0707 Delaware Account.  Essentially, the Trustee contends that every party that touched the money during its journey is liable under 11 U.S.C. §§544(b) and 550.

It is somewhat surprising that, in their competing memoranda, neither the Trustee nor Larisa, addressed the threshold issue whether the "initial" transfer from the Debtor's 7348 Schwab Account to Joseph's 7367 Schwab Account is avoidable as a fraudulent transfer.[48] Under PUFTA, the Trustee may recover a transfer from Larisa only if the transfer from the Debtor to Joseph was itself fraudulent or Joseph was a mere "conduit" of the transfer (i.e., the transfer is treated as one from the Debtor to Larisa).  Larisa herself invokes the "conduit" theory arguing that even if the transfer to Joseph and the subsequent transfers were fraudulent and avoidable under PUFTA, she is not liable because she did not end up with the funds she and was a "mere conduit" between Joseph and Marina.  (More on the conduit theory, just below).

Regardless how one conceptualizes the series of transfers at issue, the initial transfer emanates from the 7348 Schwab Account.  As explained in Part IX.A., supra, the merits of any avoidance claim the Trustee asserts will depend not only the asserted fraudulent nature of the transfer to Joseph and Joseph's subsequent transfers, but also on the nature of the Debtor's interest in the 7348 Schwab Account (i.e., whether the Debtor and Marina held the account as tenants by the entireties or as joint tenants), and the existence or non-existence of joint creditors of the Debtor and Marina.  As stated above, there are questions of material fact as to these issues.  Thus, summary judgment appears premature.

Based on the existing record, however, Larisa suggests that even if the factual issues just described are resolved in the Trustee's favor, she nonetheless is entitled summary judgment based on a "conduit" defense.  As explained below, I disagree.

---

[48]        Joseph did not file a motion for summary judgment on the fraudulent transfer claims against him.  That issue is therefore, not presently before me.

-72-

**3.**

Under 11 U.S.C. §550(a), a trustee may recover transfers avoided under 11 U.S.C. §§544

and 548 from the initial transferee, or any immediate or meditate transferee of the initial

transferee.[49]  Because the term "transferee" is not defined in the Code, many courts have adopted

a dominion and control test for determining whether a party is an initial transferee.  E.g., C.F.

Foods, 265 B.R. at 78.  Under this test, an entity that has "dominion over the money or other

asset, the right to put the money to one's own purposes" is a transferee under §550(a).  Bonded

Fin. Servs. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988).

By comparison, a "mere conduit" is an entity that receives a transfer for the limited

purpose of allowing it to "pass through" to another recipient.  C.F. Foods, 265 B.R. at 78.  The

key characteristic of a conduit is that the person or entity is under a contractual or other

obligation to use the transferred funds or assets for the benefit of a third party and may not put

those funds or assets to its own use.  In re Lenox Healthcare, Inc., 343 B.R. 96, 104 (Bankr. D.

Del. 2006) (collecting cases).  By comparison, if an entity has the "power to redirect the funds to

its own use" and may exercise dominion over the funds, the defendant is not a mere conduit.  In

re Le Nature's, Inc., 2009 U.S. Dist. LEXIS 85073, 62 (W.D. Pa. Sept. 16, 2009) (quoting Lenox

---

[49]     11 U.S.C. §550(a) provides:

> Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if
> the court so orders, the value of such property, from–
>
>> (1) the initial transferee of such transfer or the entity for whose benefit
>> such transfer was made; or
>>
>> (2) any immediate or mediate transferee of such initial transferee.

Healthcare, 343 B.R. at 103)).  Here, if Larisa lacked dominion and control, she is a "mere conduit" and not an initial transferee or immediate transferee, the Trustee may not recover the fraudulent transfer from Larisa under 11 U.S.C. §550.  See Lenox Healthcare, 343 B.R. at 103.

Larisa argues that the undisputed facts show that Marina was in control of the 0707 Delaware Account and therefore, she did not have dominion and control over the $610,000.00 transfer from Joseph.  In support of her contention, Larisa points to **Marina's** actions of: depositing the $610,000.00 check; transferring the funds by a check drawn on the joint 0707 Delaware Account to Fox Lake Realty; and withdrawing the remaining funds in 2007 and closing the account.

This argument is far too facile.  Larisa presented no evidence showing that her receipt of the $610,000.00 check (that was made out solely in her name) was conditioned on the check's deposit into an account for Marina's benefit.  Viewing the facts in the light most favorable to the non-moving party, Larisa has failed to established that she was restricted from putting the check to her own use.  Consequently, she has not met her burden of production on a material fact issue, i.e., whether she lacked dominion and control over the $610,000.00 check payable to her from Joseph.[50]   Accordingly, the Larisa Motion with respect to the $610,000.00 transfer is denied.

---

[50]     Larisa first claimed that she deposited the $610,000.00 check into the 0707 Delaware Account.  (Larisa Motion ¶75).  She then disavowed ever handling the check and claims that Marina deposited the check "into an account that Marina considered to be her own."  (Non-Debtor Defendants' Supplemental Brief at 24).  Larisa has not explained how Marina could have deposited the check without Larisa's signed endorsement.  The check endorsement is not in the summary judgment record.  Nor does she explain how Marina could consider the account "to be her own" when it consisted of money derived from a check made out to Larisa.  The suggested result is inconsistent with the MPPA presumption Larisa invoked with respect to the 7348 Schwab Account.  Moreover, only Larisa's intent, not Marina's, can overcome the presumption.

## X.  FLR'S Motion

In the Amended Complaint, the Trustee alleged five (5) claims against FLR under Counts I, VII, IX and XII.  In her response to FLR's Motion, the Trustee withdrew her claims under Counts VII and IX, leaving only Counts I and XII.  (Trustee Mem. at 66).

Counts I and XII were the subject of a motion to dismiss the original Complaint in this adversary proceeding.  In denying the motion to dismiss, I decided that the Trustee was entitled to develop the record further on those claims.  See Polichuk, 2010 WL 4878789, at *3 n.6.  The issues which must be resolved in order to determine whether FLR is entitled to summary judgment on Counts I and XII are factually and legally distinct from the issues involved in deciding the other Defendants' summary judgment motions.  Therefore, I have determined the best course is to rule on FLR's Motion separately after giving the parties a further opportunity to be heard through oral argument.

## XI.  CONCLUSION

For the reasons set forth above, the Non-Debtor Defendants' Motion will be denied. Andrew's, Lena's, and Larisa's Motions will be granted in part and denied in part.  FLR's Motion will be granted in part (to the extent that the Trustee has withdrawn her claims) and deferred in part, to be resolved after oral argument.

An order consistent with this Opinion will be entered.

Date: February 27, 2014

_____
ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE

-75-